See also 373 F.Supp. 1225.

**PROFESSIONAL ADJUSTING SYSTEMS OF AMERICA, INC., et al., Plaintiffs,**

**v.**

**GENERAL ADJUSTMENT BUREAU, INC., Defendant.**

**CHAMBERS AND BARBER, INC., on behalf of themselves and all others similarly situated, Plaintiffs,**

**v.**

**GENERAL ADJUSTMENT BUREAU, INC., Defendant.**

Nos. 72 Civ. 5122, 73 Civ. 848.

United States District Court, S. D. New York.

Aug. 6, 1974.

David Berger, H. Laddie Montague, Jr., Joel C. Meredith, Paul J. McMahon, Philadelphia, Pa., and Arthur N. Abbey, Carrow, Bernson, Hoeniger, Freitag & Abbey, New York City, for plaintiffs; David Berger, P.A., Philadelphia, Pa., of counsel.

Shearman & Sterling, New York City, for defendant; Robert F. Dobbin and Clarence W. Olmstead, Jr., of counsel.

GURFEIN, District Judge:

A motion is now made to certify this antitrust action as a class action.

This action was instituted by the plaintiff on behalf of itself and as representative of other independent insurance adjusters throughout the United States. The defendant General Adjustment Bureau ("GAB") is a corporation in the business of adjusting and settling insurance claims. Its stock was owned by approximately 175 insurance companies[1] which issue insurance policies for property damage.[2]

The complaint in the Chambers and Barber action, filed on April 24, 1972, in the United States District Court for the Northern District of California (now 73 Civ. 848) and transferred to this Court by the Multidistrict Panel,[3] alleges that the defendant and the shareholder coconspirators have combined and conspired to restrain trade unreasonably in the business of adjustment and settlement of insurance claims in violation of Section 1 of the Sherman Act. The illegal conspiracy allegedly consisted, *inter alia*, of an agreement between GAB and its shareholders to divert adjustment business to GAB and away from independent adjusters. At least some of the GAB shareholders sell insurance against property damage in every state of the Union.

Contracts insuring against property damage are an important segment of the insurance industry. When property damage occurs, provisions must be made to handle the claim. It is here that the services of insurance adjusters are utilized. An adjuster makes a thorough investigation of the claim, determines whether the policy covers the type of loss involved, and endeavors to obtain all the essential facts with which he makes a report of his investigation. Perhaps the most important function of the adjuster is to determine the extent of the loss and the amount to be paid the insured. Based on this evaluation, the adjuster will then attempt to settle the claim. Often negotiations between the adjuster and the claimant will continue for some time until a final agreement is reached.

Many insurance companies use their own employees to adjust and settle small claims. However, for claims of a more complicated nature, most insurance companies utilize the services of outside adjusters. An independent adjuster may be an individual, firm, or corporation, which is not affiliated in any way with an insurance company. Independent adjusters engage in their occupation in all parts of the United States.

The plaintiffs contend that the conspiracy is nationwide and deprives independent adjusters of the opportunity to compete against GAB for adjusting business. The class affected is said to consist of all insurance adjusters of a certain type throughout the United States. The defendant implicitly starts with the premise that there was no conspiracy, but that if there was conspiracy afoot, it could only involve a series of discrete multiple conspiracies of a local nature which cannot support the certification of a single nationwide class.

The first inquiry must be what tools are at hand for the District Judge to make up his mind on so elusive a question. It would be difficult enough, in all likelihood, to make findings on this issue after all the proof is in and the merits have been fully explored. It is much more difficult to come to a decision at an early stage of the litigation as Fed. R.Civ.P. 23(c) instructs us to do. It is almost as if we were to ask the judge in

---

1. GAB has been owned by as many as 330 insurance companies.

2. On April 15, 1971, by consent decree in an action brought by the United States, the shareholders of GAB were required to place their stock in trust and the trustee was required to divest the stock within four years. The defendant admitted no issue of fact or law alleged.

3. 72 Civ. 5122 is a companion case.

a criminal prosecution whether the conspiracy is single or multiple, chain or spoke, before the case is in.[4]

■ The surest tool in the judicial armory is normally the evidentiary hearing. We have now been instructed by the Supreme Court that we may not use a preliminary hearing to assess the merits before determining the class action question. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 2152, 40 L. Ed.2d 732 (1974). The Court in *Eisen*, however, singled out for favorable mention Judge Wisdom's conclusion in Miller v. Mackey International, Inc., 452 F. 2d 424 (5 Cir. 1971), where the Court of Appeals *rejected a preliminary inquiry into the merits* of a proposed class action. 417 U.S. at 178, 94 S.Ct. at 2153. Judge Wisdom in fact had remanded to the District Court for *a hearing on the propriety of the case being brought as a class action and for findings of fact on that issue.* 452 F.2d at 430–431.

A strong reason for denying a hearing on the merits is the delay it engenders. One may doubt whether a full evidentiary hearing with findings on the subsidiary issue would be less delaying in the particular antitrust case at bar.

■ On the other hand, it is hard to conceive that the Court is limited to a simple reading of the complaint. See Huff v. N. D. Cass Co., 485 F.2d 710, 713 (5 Cir. 1973); Matarazzo v. Friendly Ice Cream Corp., 62 F.R.D. 65, 67 (E.D. N.Y.1974) (Bartels, J.). We say in other judicial contexts that mere allegation is not proof. Yet, side by side, we have the doctrine that the allegations of a complaint are to be taken as true against motions to dismiss. To adopt the latter doctrine in Rule 23 motions, however, would be to give the plaintiff an enormous advantage. It should take more than *ipse dixit* to make a class.

If speed is of the essence and if hearings drag, the full hearing on the class action is not a particularly viable solution. The choice must be somewhere between the pleading and the fruits of discovery which are made available to the judge. Enough must be laid bare to let the judge survey the factual scene on a kind of sketchy relief map, leaving for later view the myriad of details that cover the terrain. But to find its way, the Court must know something of the commonality of action or frustration that binds the class.

Here the answer is discovery directed at an early stage of the litigation to the very purpose of defining the class or determining that it is too amorphous for judicial handling or that a class action is not superior to other available methods. Manual for Complex Litigation, 1.40.

Discovery has thus far elicited certain evidence which, if believed, tends to support some allegations of the complaint. For example, Ralph B. Hale, a former employee of the Hartford Fire Insurance Group, a shareholder of GAB, states that while a Claims Manager for the Hartford Fire Insurance Group in San Jose, California, he was visited in his office by Stanley Clark, a Claims Manager employed by GAB, and was instructed by Clark " . . . that there existed a policy and understanding between the General Adjustment Bureau and the Hartford Fire Insurance Group and other shareholders of the General Adjustment Bureau that all fire claims would be assigned to the General Adjustment Bureau without exception. . . . "[5] Shortly thereafter, the Property Supervisor of the Hartford Fire Insurance Group telephoned Hale and reiterated Mr. Clark's instructions to send claims to GAB. In 1970, Mr. Hale was informed of the same policy and understanding by James Dougherty,

---

4. There is no prior indictment to rely on here as in some antitrust cases. See, e. g., City of Philadelphia v. American Oil Co., 53 F.R.D. 45, 47–50 (D.N.J.1971); Turnoff v. N. V. Nederlandsche, 51 F.R.D. 227 (E.D. Pa.1970).

5. Hale, Affd. at ¶ 6.

Regional Claims Supervisor for the Hartford Fire Insurance Group and was shown monthly reports reflecting that policy.

During the deposition of Robert L. Barber, there was further indication that GAB employees visited shareholders to enforce a boycott. Mr. Barber testified that the same Mr. Clark and Mr. Clark's supervisor visited him in 1958 when he was employed by Fireman's Fund Insurance Company, a shareholder of GAB, and stated that a "report" had to be made on Mr. Barber because he was " . . . not assigning Fireman's Fund claims to the General Adjustment Bureau. . . . "[6] At that time, Mr. Clark stated that it was part of a GAB manager's duties to "report" on employees of GAB shareholders who were " . . . using services other than the General Adjustment Bureau."[7] Presumably a report was made since shortly thereafter Mr. Barber " . . . did get a complaint from [his] boss in San Francisco because [he] was not using General Adjustment Bureau."[8] A GAB manager in Portland, Oregon, named Carl Siser confirmed to Mr. Barber that a GAB manager's duties included seeing to it that claims are assigned to the General Adjustment Bureau and not to independents.[9]

These bits of testimony warrant a finding that the plaintiff's claims of conspiracy *may* have merit and provide a genuine issue for litigation. See Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 457 (E.D. Pa.1968).

It has already been indicated by the defendant that its defense on the merits will, in all events, be proof that each insurance company or group and each regional manager was autonomous, thus negating the very conception of a concert of action. The defendant will attempt to prove, as well, that many independent adjusters got substantial business from stockholders of GAB, again tending to negate any planned discrimination against them.

This approach seems to bring us to the merits, which we should not try to pass on now. The defendant maintains, however, that the nature of the proof also demonstrates the unmanageability of the action as a class action as well as the disparate nature of the relationship between various of the approximately 1300 insurance adjusters suggested for the class with their respective individual local insurance company representatives. That requires some consideration.

It does not necessarily follow that the requirement of Rule 23(b)(3) —that questions of law or fact common to the members of the class predominate over any questions affecting only individual members—is not met because there may be a circumstantial defense.

In my view the common questions of law and fact predominate. The issue is, therefore, whether the tendering of a defense, because it is complex in character, should divest the class action of its otherwise superior quality. I think not. In any extended case evidence of a similar kind tends to become cumulative and subject to control by the trial court.

To try this issue in separate action after separate action would be wasteful. Only if questions affecting individual members alone predominate or if a class action is not superior to other available methods, should the class action be denied.

On the other hand, to bar a class action would mean that GAB could never be challenged on the nationwide conspiracy allegedly focused in GAB. If it is desirable that full scope be allowed for proof of the conspiracy alleged, there is

6. Barber, Depos. at 132.

7. Barber, Depos. at 132, 134.

8. Barber, Depos. at 132.

9. Barber, Depos. at 137.

no way to do that except by a class action.

In that sense "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The number allegedly injured is sufficiently large. Green v. Wolf Corp., 406 F.2d 291, 301 (2 Cir. 1968), cert. denied, 395 U.S. 977, 89 S. Ct. 2131, 23 L.Ed.2d 766 (1969). In this case, it is hard to conceive of smaller sub-classes, for the accent is not on the local area but on a single vehicle, GAB, that operated on a national scale. "The controversy" involves the alleged use of that single vehicle.

■ From the defendant's point of view as well, a class action should be thought superior in this case if there is merit in its own position. One purpose of the class action is to reach a judgment that will be as binding on the class as any adjudication in rem. Naturally, the larger the class, the more people are bound to the *res judicata* effect.

So, too, a small sub-class, even if definable, would be no protection to a defendant interested in settlement, but who, if he settled with a sub-class alone, might leave himself vulnerable to further attack.

Finally, in a class action, the defendant will not be concerned that judgments may vary from forum to forum.

If we assume a nationwide conspiracy for purposes of the motion, the very status of an independent adjuster satisfies the requirement of standing. I recently discussed this problem in Kinzler v. New York Stock Exchange, 62 F.R.D. 196 (S.D.N.Y.1974). There the registered representatives of the brokerage house could have lost customers for a variety of reasons unrelated to the "transfer of employment" freeze imposed by the Stock Exchange. It appeared, therefore, that each person in the purported class would have to establish his own injury to satisfy the requirement of standing in an antitrust boycott case.

■ The complaint here, on the contrary, alleges an economic discrimination against a defined class—*all* the independent adjusters. Whether that can be proved remains to be seen. But in the attempt to prove it there does emerge a common question of law and of fact for all independent adjusters. Was there a conspiracy among the shareholders of GAB—the insurance companies—to favor GAB and to discriminate against independents, and, if so, was this an illegal activity under the Sherman Act? When the central issue in an antitrust action is the existence of the alleged conspiracy, courts have found a class action to be proper. Jacobi v. Bache & Co., Inc., CCH Trade Cases [1972] ¶ 73,980; Turnoff Drug Dist. Inc. v. N. V. Nederlandsche, *supra*, 51 F.R.D. at 233; State of Minnesota v. United States Steel Corp., 44 F.R.D. 559, 572 (D.C.Minn.1968).

If the other criteria of Rule 23 are met, this action should proceed as a class action.

My conclusions under Rule 23(a) are:

(1) *Numerousness of the class:*

It has been shown that there are at least 1300 independent insurance adjusters listed in trade directories. That is a numerous enough class.

If the conspiracy is all-embracing, involving all the independents in the industry, the class forms itself. The proof of the conspiracy and its general objective defines its victims. See Gold Strike Stamp Co. v. Christensen, 436 F. 2d 791 (10 Cir. 1970); Siegel v. Chicken Delight, Inc., 271 F.Supp. 722 (N.D.Cal., 1967), aff'd sub nom. Chicken Delight, Inc. v. Harris, 412 F.2d 830 (9 Cir. 1969); City of Philadelphia v. American Oil Co., supra. As Judge Decker said in Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484, 488 (N.D.Ill.1969): "The single most important issue is whether the defendants' conspiratorial agreements actually existed." Whether such agreements existed and whether

they are illegal are "broad questions" and claims based upon them would predominate although they vary among the adjusters. See Sunrise Toyota, Ltd. v. Toyota Motor Co., Ltd., 55 F.R.D. 519 (S.D.N.Y.1972) (Lasker, J.).

The defendant contends, however, that the class cannot be defined with precision. The plaintiffs assert that they can glean the names of at least the active independent adjusters from publications like Best's Manual of Recommended Insurance Adjusters, Hines Directory and the Claim Service Guide.

■ The plaintiffs will be expected to supply the list of proposed class members for the scrutiny of the defendant before an application for the sending of notices is made. The parties will be given an opportunity to comment on the adequacy of the list. If the defendant should think the list tendered to be too short, it may add names for consideration by the Court. If this is to be a class action, it should come as close to a binding resolution of the issue as is possible, subject to optings out. And it may well be that some of those nominated for the class will ultimately be found to have suffered no damage at all even if a conspiracy is proved.

(2) *Questions of law or fact common to the class:* This issue has been analyzed, *supra.*

(3) *The claims of the representative parties are typical of the claims of the class:*

We have seen that the principal issue and the claim thereunder are typical of the claims of plaintiffs and independent adjusters.[10]

The defendant asserts, however, that there is no uniform pattern of discrimination that can be proved. This is based upon assertions of disparity of treatment among independent adjusters. Thus, it is said that some companies which are charged with not giving business to certain independent adjusters do give business to others, raising the implication that all are not equally skilled. So, too, questions of ability to compete with GAB's so-called assessment billing schedule are raised, allegedly in inconsistent fashion by different plaintiffs. The defendant points to other alleged inconsistencies in approach as well.

■ This type of thing goes to the merits. These circumstances may, indeed, have a bearing, at a later stage, on whether the plaintiffs can continue to be representative of the whole class. More can be learned about that matter after notices have been sent out. But the circumstance that all class members are not situated precisely the same or even that the class representative may have to select particular weapons from a whole arsenal of arguments does not defeat the cohesiveness of a class devoted to proving common facts and common legal doctrine.

The defendant has done an excellent job in its early skirmishing, but its development is essentially a defense on the merits on which I pass no judgment whatever.

(4) *The plaintiffs fairly and adequately protect the interests of the class:*

No substantial conflict of interest has been adduced. In this case that is enough to avoid disqualification. There is no complaint that plaintiffs' counsel are unskilled in antitrust work. They are skilled antitrust lawyers.

My conclusion under Rule 23(b), as applicable, is that there would be a risk of inconsistent adjudications if there were prosecution by individual members of the class in separate actions.

The defendant presses strongly upon the Court two cases as supporting its general position that a class action

---

10. Professional Adjusting Systems of America, Inc. ("PASA") is a trade association of independent adjusters. The other three plaintiffs are independent adjusters.

should not be allowed: Hettinger v. Glass Specialty Co., Inc., 59 F.R.D. 286, 296 (N.D.Ill.1973), and Lah v. Shell Oil Co., 50 F.R.D. 198, 200 (S.D.Ohio 1970). These cases were carefully considered by the respective courts and deserve careful comment.

*Hettinger, supra,* involved a claim by several Illinois glass repair shops that certain insurance companies, as part of their *individual* glass claim procedures, had *each separately* entered into agreements with a number of different glass shops and that these agreements had restrained competition in the glass repair business. As Judge Bauer noted, "no allegation is made of any agreement or conspiracy among the insurance company defendants." 59 F.R.D. at 288 n. 1.

In the present case, on the contrary, there is alleged a conspiracy among the insurance company shareholder coconspirators. Their medium of execution is allegedly a *single* entity, the defendant, GAB. The substance of the action is, thus, quite different.

It would be disingenuous, however, to imply that the Court's rationale in *Hettinger* does not raise questions I have considered in the context of this case— the contention that not all adjusters are able to provide equal service, and that separate facts may be provable with respect to local areas. I note that the very charge here is that independent adjusters were not selected on the basis of qualification alone. Moreover, if a single conspiracy is, in fact, proved, its local manifestations would then be more evidentiary than substantive.

The argument in *Hettinger*, deriving from *Lah, supra,* that coercion is an operative fact to be proved separately may apply where the person coerced is the plaintiff who must show individual injury. It does not necessarily apply where the plaintiff is not alleged to have been subjected to coercion himself, but where a pattern of coercion of insurance agents is alleged to have detrimentally affected a whole class of independent adjusters.

### The McCarran Act

The defendant urges finally that a class action would not be appropriate because, rather than a common question of law, there would emerge fifty-one different questions of law depending upon the separate laws of fifty states and the District of Columbia. In support of its position, the defendant relies upon the McCarran Act, 15 U.S.C. §§ 1011–1015 ("the Act"). It contends that the Act exempts the "business of insurance" from the federal antitrust laws to the extent that such business is regulated by state law, and that claim adjustment is part of the "business of insurance." It urges therefore that (1) state regulation may preempt federal antitrust liability and oust federal antitrust jurisdiction; and (2) identical practices performed in several states may produce different *federal* antitrust results according to the laws and regulations of the various states.

I think it is unnecessary to decide whether claim adjusting is part of "the business of insurance." Cf. S.E.C. v. National Securities, Inc., 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). Assuming that claim adjusting is the "business of insurance" and that there is general exemption from federal antitrust law when there is state regulation, we must remember the antitrust exception in the Act.

Section 3(b) of the Act, 15 U.S.C. § 1013(b) provides: "Nothing contained in this Chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce or intimidate, or act of boycott, coercion or intimidation."

██ The gravamen of the complaint here is the boycott of independent claim adjusters. If there is a boycott, the Sherman Act remains applicable in spite of state regulation of the "business of insurance" or the existence of a state antitrust law. Monarch Life Ins. Co. v.

Loyal Protective Life Ins. Co., 326 F.2d 841 (2 Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 968, 11 L.Ed.2d 971 (1964). In *Monarch,* Judge Kaufman (now Chief Judge) reviewed the purposes of the Act as follows:

" . . . In passing the McCarran Act, Congress was attempting to return primary responsibility for insurance regulation to the states; only when a state had not acted, would federal legislation become effective. § 3(b), on the other hand, was designed to exempt certain types of cases from this general pattern of deference to state regulation; where boycotts, or agreements to boycott were concerned, the federal policy expressed through the Sherman Act was to be preeminent."

The clear implication from the *Monarch* decision is that "boycott" in the Act means the same as it does in antitrust law generally. The Court of Appeals stated explicitly: "Under our interpretation, all boycotts or agreements to boycott condemned by the Sherman Act are rendered subject to federal law. . . . " 326 F.2d at 846.

The allegations of boycott are clear and specific.[11] Group boycotts are illegal *per se.* Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959). The allegations are sufficient, accordingly, to require the application of the Sherman Act rather than of state law.

This is, of course, not an ultimate decision on the merits. It is limited to the class action aspect of the matter as it appears at this stage of the litigation.

I have accordingly determined that this action is properly a class action. I am impelled to make that decision under the mandate of Rule 23(c)(1) for an early determination, but

I shall make the order conditional on the right of the defendant to make application when the discovery has progressed further to vacate or alter or amend the order. In the meantime, the parties will consider this to be a proper class action. I have set forth a preliminary requirement of class definition before application for the sending of notice. The plaintiffs may submit an order on notice accordingly at the proper time. Counsel will not communicate with class members except by direction of the Court.

The Court will also entertain a motion for further discovery based upon this opinion. See the earlier Memorandum on interrogatories. 373 F.Supp. 1225 (1974).

---

11. The opinion of my colleague Judge Metzner in Steingart v. Equitable Life Assurance Society of U. S., 366 F.Supp. 790 (S.D.N.Y.

1973), specifically found that no boycott had been alleged in that case.