Michael MARTINO, McDonald's Drive-In of Appleton, Wisconsin, a Wisconsin Corporation, and McDonald's Drive-In of Manitowac, Wisconsin, a Wisconsin Corporation, Individually and on behalf of all persons or corporations similarly situated, Plaintiffs,

v.

McDONALD'S SYSTEM, INC., an Illinois Corporation, and Franchise Realty Interstate Corporation, an Illinois Corporation, Defendants.

No. 77 C 98.

United States District Court,
N. D. Illinois, E. D.

Jan. 5, 1979.

Judson H. Miner, Davis, Miner & Barnhill, Chicago, Ill., for plaintiffs.

Alan H. Silberman, Louis C. Keiler, Gary Senner, Earl E. Pollock, Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendants.

## MEMORANDUM DECISION

MARSHALL, District Judge.

The plaintiffs in this treble damage antitrust class action allege that the defendants have imposed on the plaintiff class tying arrangements illegal under § 1 of the Sherman Act, 15 U.S.C. § 1. Jurisdiction is invoked under 15 U.S.C. §§ 15, 26. The defendants are McDonald's System, Inc. and Franchise Realty Interstate Corporation, an affiliate of McDonald's. The

named plaintiff is Michael Martino, who is currently the owner-franchisee of two McDonald's restaurants. Martino seeks to represent a class of all current McDonald's franchisees. Martino alleges that the defendants required prospective franchisees, as a condition to obtaining a franchise, to lease or sublease from Franchise Realty Corporation the property underlying the restaurant. The motion for certification of the class of all current McDonald's franchisees is now pending.[1]

The defendant McDonald's is a franchisor of over 4,000 fast food drive-in restaurants. Approximately twenty-five per cent of all McDonald's franchises are owned by McDonald's System. The remaining seventy-five per cent are owned by individual operators. In almost all cases, McDonald's finds an appropriate site for a restaurant, and supervises the planning and construction of the restaurant. McDonald's then either retains ownership or offers it to a current franchisee or a potential franchisee who has expressed interest in becoming the operator of a McDonald's franchise. McDonald's affiliate, Franchise Realty, currently either owns or leases the underlying property of over 99% of the franchises. The license of the franchise and the lease of the property generally are for terms of twenty years.

Plaintiff Michael Martino is a franchisee who currently owns two franchises, one in Manitowoc, Wisconsin and the other in Appleton, Wisconsin. Martino began his career with McDonald's in 1959 by managing a store owned by his brother Bruno in Beloit, Wisconsin. Then in 1962 Michael and Bruno Martino purchased the McDonald's unit in Manitowoc from its original owners. In 1963, Michael and Bruno purchased the Appleton unit directly from McDonald's. The management of McDonald's has informed Michael Martino that it will not renew the license for the Manitowoc franchise when the license expires in 1979. No such indication has been made with respect to the Appleton restaurant.

The plaintiffs have made two tying claims. They allege first that McDonald's would not license a franchise unless the franchisee also leased the property underlying the restaurant from Franchise Realty. Plaintiffs allege that this requirement forces franchisees to pay a considerably higher rent than they would have absent the requirement. Martino alleges that he leased the Manitowoc property from Franchise Realty for $1,100 per month, over $300 more than Franchise Realty paid in rent to the owner of the property.

The plaintiffs' second tying allegation is that defendants tied the purchase of Coca Cola to the licensing of the franchise. According to the plaintiffs, the McDonald's franchise letter agreement requires franchisees to agree to purchase only those supplies and foodstuffs which meet McDonald's specifications and quality standards. Because Coca Cola is the only cola that meets with McDonald's approval, plaintiffs must purchase Coca Cola. Plaintiffs allege that McDonald's receives the benefit of this tie in the form of free advertising. Until 1973 Coca Cola rebated thirty-five cents per gallon of Coca Cola purchased to the Operators National Advertising Fund (OPNAD), a corporation established by owners of McDonald's franchises to conduct national advertising. After 1973, Coca Cola paid the thirty-five cent rebate directly to the franchisee as an advertising allowance. Plaintiffs allege that even considering these rebates as benefits to them, they could have saved money by buying a comparable cola.

### Rule 23 Requirements

█ In a motion for class certification, we must take care not to consider the merits of the plaintiff's claims. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Although the plaintiffs have the burden of proof in

---

1. Although plaintiffs' complaint defines the class as all franchisees since 1971, the plaintiffs have argued in their motion for class certification for certification of a class of current franchisees. Because plaintiffs have not satisfied their burden of proof under Rule 23 with respect to any former franchisees, we will determine here only whether a class consisting of current franchisees is appropriate.

demonstrating that the elements of Rule 23 have been satisfied, *Windham v. American Brands, Inc.*, 565 F.2d 59, 64 n.6 (4th Cir. 1977) (en banc), we must determine whether the plaintiffs have satisfied Rule 23's requirements without prejudging any issues relevant to the named plaintiff's or the class's recovery on the merits. Inherent in this process is an element of speculation imposed by the limited state of the record. *See Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975).[2]

*Rule 23(a)*

■ Defendants do not doubt, nor do we, that 2,600 potential class members is sufficiently numerous so as to make joinder impracticable as required by Rule 23(a)(1). Rule 23(a)(2) requires the existence of questions of law or fact common to the class. This requirement seems superfluous, especially in a Rule 23(b)(3) case such as this one, in which common questions must predominate over individual ones. *See* 3B *Moore's Federal Practice*, ¶ 23.06–1 at 23–171 (1978). Nevertheless, as our later discussion will indicate, plaintiffs have met their burden here. Because the Coca Cola requirement is imposed on all franchisees, legal and factual questions with respect to the alleged Coca Cola tie are common to the class. Common legal and factual questions also exist with respect to the legality of McDonald's leasing practices.

Rule 23(a)(3) requires that the named plaintiff's claims be typical of the claims of the class members. Defendants argue that Martino's situation is atypical because this action is only a vehicle for Martino's real grievance, which is Martino's impending loss of his Manitowoc franchise. To support this theory, the defendants note that Martino could not have been aggrieved by leasing from Franchise Realty or buying only Coca Cola, inasmuch as he waited many years after acquiring his franchises and even several years after learning of the damage

resulting from the alleged ties before bringing suit. Moreover, defendants assert that most potential class members, unlike Martino, are satisfied with their treatment from McDonald's System and do not wish to challenge the leasing arrangement or the approved source requirement. Finally, defendants assert that Martino's substandard performance in operating his units makes him an atypical franchisee.

■ None of these assertions by defendants demonstrates atypicality. The named plaintiff satisfies Rule 23(a)(3)'s requirement if his claim is based on the same legal theory as the class members' claims. *Santiago v. City of Philadelphia*, 72 F.R.D. 619, 625 (E.D.Pa.1976); 7 C. Wright & A. Miller, *Federal Practice and Procedure*, § 1769 at 614 (1972). Once the named plaintiff has shown that the issues in his claim are in approximately the same posture as those issues would be in the class members' claims, the plaintiff has shown typicality. *Cottrell v. Virginia Electric & Power Co.*, 62 F.R.D. 516, 520 (E.D.Va. 1974). Martino's claim is based on alleged violations of the antitrust laws by virtue of requirements allegedly imposed on all franchisees in the class. Martino's alleged substandard performance as a franchisee and any grievance he may have against McDonald's for the loss of a franchise are irrelevant, because neither his performance nor his feelings toward McDonald's are related to his antitrust claims. Rule 23(a)(3) requires that the representative parties' claims be typical, not that the parties themselves be typical.

■ Defendants' assertion that most franchisees are satisfied with their situation is not relevant, even if true, because a judge may not refuse to certify a class simply because some class members may prefer to leave the violation of their rights unremedied. 3B *Moore's Federal Practice*, ¶ 23.06–2, 23–197 (1978). *Cottrell v. Virgin-*

---

**2.** As the court in *Professional Adjusting Systems of America v. General Adjustment Bureau, Inc.*, 64 F.R.D. 35, 38 (S.D.N.Y.1974), said regarding the evidence necessary to determine the appropriateness of a class action: "Enough

must be laid bare to let the judge survey the factual scene on a kind of sketchy relief map, leaving for later view the myriad of details that cover the terrain."

*ia Electric & Power Co., supra.* Moreover, because the potential remedy would be damages for all franchisee class members, we should not refuse to certify the class because relief would take different and possibly conflicting forms for different members of the class. *See United States v. School Bd. of City of Suffolk*, 418 F.Supp. 639, 647 (E.D.Va.1976). Martino alleges that McDonald's imposed upon him the same restrictions it imposed upon all of the other franchisees, and he seeks treble damages for all class member franchisees. His claims are typical.

■■■ Defendants also argue that Michael Martino is not an adequate representative of the class under Rule 23(a)(4). Rule 23(a)(4) requires not only that the plaintiff's attorneys be competent to conduct a class action, but also that the named plaintiffs' interests are coextensive with the interests of the class members and that no conflict of interests exist between the named plaintiffs and the class members. *Plekowski v. Ralston-Purina Co.*, 68 F.R.D. 443, 452 (M.D.Ga. 1975). Defendants argue that Martino's real grievance, the impending loss of his Manitowoc franchise, is antagonistic to the claims of other class member franchisees. Regardless of Martino's feelings towards McDonald's, Martino's only legal claims are based on the antitrust laws, and there is no reason that Martino cannot or will not diligently prosecute the action.[3] Defendants also argue that Martino, as a dissatisfied franchisee who will soon lose his franchise for substandard performance, cannot adequately represent a class of contented franchisees who see value in the uniformity of the McDonald's system. The defendants have supported this assertion with several affidavits and depositions of satisfied franchisees who see no merit in a suit against McDonald's. But this evidence, solicited by McDonald's, can hardly be considered the objective consensus of the large class of McDonald's franchisees. *See Krehl v. Baskin Robbins Ice Cream Co.*, 78 F.R.D. 108, 116 (C.D.Cal.1978). *See also Sperry Rand Corp. v. Larson*, 554 F.2d 868 (8th Cir. 1977); *Chevalier v. Baird Savings Ass'n*, 72 F.R.D. 140 (E.D.Pa.1976); *Aamco Automatic Transmissions, Inc. v. Tayloe*, 67 F.R.D. 440 (E.D.Pa.1975). If franchisees are indeed satisfied with the McDonald's system, they may opt out of the class action after receiving notice. The opt-out procedure is much more likely to indicate franchisee sentiment than are franchisor-solicited affidavits from hand-picked franchisees. Michael Martino has been with McDonald's for almost twenty years. Because he intends to remain a franchisee, his stake in the success of the McDonald's system remains substantial.[4] The relevance of Martino's performance ratings as a franchisee escapes us, because such performance does not indicate that Martino will not protect the interests of other franchisees with respect to the tying claims. We hold that Michael Martino will adequately represent the interests of the class as required by Rule 23(a)(4).

*Rule 23(b)*

Plaintiffs seek to certify the class of franchisees under Rule 23(b)(3), which requires that issues common to the class predominate over individual issues. Before determining whether plaintiffs have satisfied this test, we must delineate the basic issues that the plaintiffs will have to confront in proving a tying arrangement.

---

3. Mr. Martino has had recent medical problems which adequately explain his delay in bringing this action until several years after discovering the injury that defendants' practices were allegedly causing.

4. Defendants cite cases holding that former franchisees cannot adequately represent current franchisees. *See, e. g. Aamco Automatic Transmissions, Inc. v. Tayloe, supra; Seligson v. Plum Tree, Inc.*, 61 F.R.D. 343, 346 (E.D.Pa. 1975). These cases are inapposite, however, because Martino is not a former franchisee. He has not yet lost his Manitowoc unit, and no suggestion has ever been made that he will lose the Appleton franchise. Thus this case does not present a situation in which the interests of the representative party, as a former franchisee, who has no stake in the continued success of the franchisor's system, are in direct conflict with the interests of the current franchisees who do hope for continued success.

 Tying arrangements are violations of the Sherman Act *per se,* because such arrangements serve no purpose other than to restrain competition. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). To prove a tying claim, the plaintiff must show first that the defendant conditioned the sale of one product, the tying product, on the purchase by the plaintiff of an additional item, the tied product. *Id.* at 5–6, 78 S.Ct. 514. The plaintiff, however, must show more than mere persuasion by the defendant. The defendant, by wielding his market power in the tying product, must coerce the plaintiff to take the unwanted product. *Id.; Sargent-Welch Scientific Co. v. Ventron Corp.,* 567 F.2d 701, 708 (7th Cir. 1977). *See also Fortner Enterprises Inc. v. United States Steel Corp.,* 394 U.S. 495, 503–04, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *United States v. Loews, Inc.,* 371 U.S. 38, 49, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). A related element is the requirement that plaintiff show that defendant has sufficient market power in the tying product to make his coercion regarding the tied product effective. *United States Steel Corp. v. Fortner Enterprises,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) *(Fortner II).* Thirdly, the plaintiff must show that a not insubstantial amount of interstate commerce is involved in the transactions between plaintiff and defendant. *Northern Pacific Ry. Co. v. United States, supra,* 356 U.S. at 5–6, 78 S.Ct. 514. The final element in a tying case is the proof of fact of damage. To establish the right to recover damages in a private suit under § 4 of the Clayton Act, the plaintiff must establish that he was injured as a result of defendant's violation of the antitrust laws. *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir. 1977) *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); *Response of Carolina, Inc. v. Leasco Response,* 537 F.2d 1307, 1321 (5th Cir. 1976).

 To prove that common questions predominate as required by Rule 23(b)(3), plaintiffs must show that the proof of the elements of a tying claim can be conducted on a class-wide basis. To demonstrate that proof of the existence of a tie would not be an individual question, the plaintiffs must establish some method of proving class-wide coercion. *Ungar v. Dunkin Donuts of America, Inc.,* 531 F.2d 1211, 1218 (3d Cir.) *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Halverson v. Convenient Food Mart, Inc.,* 69 F.R.D. 331, 336 (N.D.Ill. 1974). If the alleged tying arrangements were imposed by express contractual provisions in franchise agreements, or if the operation of the terms of a written contract imposed the tie, the court may presume that proof of coercion will be class-wide. *Bogosian v. Gulf Oil Corp., supra* at 452; *Halverson v. Convenient Food Mart, supra.* If, however, plaintiffs cannot prove that a contractual arrangement exists, then each class member would have to show individually that defendant coerced him to take the unwanted product as well as the tying product. This individual proof would cause individual questions to predominate over questions common to the class. Thus the certification of this class action depends upon whether plaintiffs have shown that coercion could be provable by reference to evidence common to all class members.

To determine this issue with respect to the alleged real estate tie, a summary of McDonald's franchising procedure is necessary. McDonald's licenses its franchises in four different types of transactions. The most frequent method is for McDonald's to sell a unit directly, either to the operator of another franchise or to a new operator. The unit may be a new unit or a company-owned unit that McDonald's wishes to sell. Sometimes an operator has a prearranged offer whereby McDonald's is required to give him the right of first refusal on any new franchise developed within the area of his existing unit. A third method is for McDonald's to allow prospective franchisees to manage, with an option to buy, units owned by a McDonald's subsidiary. The final type of transaction occurs when an existing franchisee sells its units to a new franchisee. *See* Coons affidavit, Defendants' Exhibit 1.

When a prospective new franchisee inquires about the possibility of becoming a McDonald's operator, McDonald's sends a brochure explaining the process and the necessary financial commitments. McDonald's screens all applicants, and those who are deemed qualified are sent preliminary agreements which the prospective franchisee signs, making a $4,000 deposit, $1,500 going to McDonald's and $2,500 to Franchise Realty for site development. This preliminary agreement and deposit are not binding upon either McDonald's or the prospective franchisee. After executing the preliminary agreement, the prospective franchisee undergoes training as a prerequisite to being offered a McDonald's unit. See Coons deposition, pp. 21–60.

When McDonald's has completed plans for a new unit or decides to license a company-owned unit, McDonald's will offer the franchise either to a new prospective franchisee or to one who already owns a franchise. In either case, the formal offer takes the form of a franchise letter agreement, which requires the franchisee to accept or reject the franchise at this point. See Coons affidavit, Defendants' Exhibit 1. Although the offering letters are not form letters, all have the same general format and differ only as to the terms such as amount of rent. Coons deposition at 74. The current letter agreement has been in use only since January, 1977. McDonald's provided the plaintiffs with sample agreements which were in effect prior to the present agreement. All four samples, attached as plaintiffs' exhibits, required the franchisee to agree to sign a lease agreement and a license agreement with the defendants before the franchisee could obtain the franchise. See Plaintiffs' Exhibits 21–24.

The sample franchise letter agreements do not apply to the period before 1964, when Donald R. Conley was in charge of franchising. Mr. Conley testified, however, that he or his staff met with 99% of all prospective franchisees and told them that McDonald's required franchisees to lease from Franchise Realty. Conley deposition at 177–79. Furthermore, Mr. Conley supplied forms of letters he sent to prospective franchisees, which indicated that a franchisee could only obtain a franchise if he also leased from Franchise Realty. Plaintiffs' Exhibits 13 and 14.

Furthermore, the license agreement always provided the specific property description of the franchise. See Plaintiffs' Exhibits 1 and 8. Mr. Coons, currently senior vice-president of McDonald's in charge of licensing and franchising, testified at his deposition that the property described in the license agreement is generally owned or leased by the defendants when the license agreement is signed. Coons deposition at 32–41.

Furthermore, the plaintiffs have convincingly demonstrated that at least since 1961, McDonald's has had a firm policy of requiring franchisees to lease the property from Franchise Realty. Neither Mr. Coons nor Mr. Conley, both of whom were directly involved in franchising, could definitely recall a single instance since 1960 in which the franchisee owned the property or leased it from someone other than McDonald's, except for forty-four Washington, D. C. area franchises. These exceptions were all owned by a Washington partnership which had a special exclusive territory agreement with McDonald's dating from 1959.[4] Moreover, Mr. Conley, who was in charge of franchising procedures in the early 1960's, testified that McDonald's "drew a line" in 1961 and decided to allow no more exceptions. Conley deposition at 19. Thus the uniform effect of McDonald's franchising process was to require the franchisee to lease the premises as a condition to obtaining a license to operate a restaurant.[5] See

---

**4.** One other exception was a Phoenix franchise originally licensed by the McDonald brothers in 1952 and which later became part of the McDonald's system.

**5.** The fact that some franchisees own a portion of the land underlying or surrounding their restaurant is irrelevant, inasmuch as the plaintiffs' claim is that McDonald's requires franchisees to lease a parcel of land from the defendant. Whether a franchisee owned an adjoining parcel is not relevant to this question. Similarly, the fact that some franchisees bought their units from existing franchisees

*Milonas v. Amerada Hess Corp.*, 1976–2 Trade Cases ¶ 61,069 at 69,820 (S.D.N.Y. 1976).

An arrangement such as this one is precisely the situation in which coercion can be inferred on a classwide basis. *See Halverson, supra* at 335. No need exists to examine individual franchise situations to determine whether pressures extrinsic to the agreements induced franchisees to sign the lease. We have evidence that McDonald's had a policy, with apparently no exceptions, of requiring potential franchisees to lease the property underlying their restaurants from Franchise Realty. The various forms of the franchise letter agreement demonstrate that the execution of a lease was a condition of obtaining the franchise. During the early period of McDonald's history, form letters sent to prospective franchisees described the real estate policy, and Mr. Conley testified that he or his staff delineated that policy orally to virtually all new franchisees. Finally, the license agreement only gave the right to operate a franchise at a specific location, where the land was already owned or leased by Franchise Realty. Thus the operation of the contract's terms had the effect of requiring the franchisees to lease from Franchise Realty. *See Bogosian v. Gulf Oil, supra* at 452. The cumulative effect of this evidence induces us to hold that proof of coercion can be presumed to be classwide. *See id.* at 452; *Krehl v. Baskin Robbins Ice Cream Co., supra* at 118; *Siegel v. Chicken Delight*, 448 F.2d 43 (9th Cir. 1971), *cert. denied*, 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). *See also Hill v. A–T–O, Inc.*, 535 F.2d 1349 (2d Cir. 1976). If coercion is presumed, the state of mind of individual franchisees is irrelevant, as is the fact that

the prospective franchisees sought out McDonald's and willingly signed the agreements.[6] Even illegal contracts may be economically advantageous and desirable. *See American Manuf. Mutual Ins. Co. v. American B–P Theatres, Inc.*, 446 F.2d 1131, 1137 (2d Cir. 1971). *See also Carpa, Inc. v. Ward Foods*, 536 F.2d 39, 46 (5th Cir. 1976).

Our conclusion, however, only relates to those franchisees who acquired their franchises after McDonald's no longer allowed exceptions to the policy of requiring franchisees to lease from McDonald's. Plaintiffs admit that in over 60% of the first 160 McDonald's franchises, the operator did not lease from Franchise Realty. Plaintiffs' Reply Memorandum at 4–5. Thus anyone acquiring a franchise with a concurrent lease prior to 1961, or whenever the practice was established, probably could have secured a different arrangement if he so wished. At least this possibility makes individual proof of coercion necessary for all franchisees acquiring their franchises prior to 1961. Furthermore, anyone who owns a McDonald's franchise, but does not lease from Franchise Realty, has no standing and cannot be a member of the class regardless of when he obtained his franchise. Because we do not currently have enough factual evidence to determine if and when the alleged policy was firmly established, at this time we can only say that proof of coercion will be classwide as to those franchisees who acquired franchises after the policy was established. We can further refine and clarify this class definition when plaintiffs have demonstrated exactly when McDonald's established its policy.

As for the alleged tie of Coca Cola, the plaintiffs have alleged that all franchisees were required by the franchise agreement

would not free the defendants from a tying claim. *See Northern v. McGraw-Edison Co.*, 542 F.2d 1336 (8th Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977). Thus such situations would not introduce individual questions of fact into the class action, since subsequent purchasers would be subject to the same terms as original purchasers.

**6.** Moreover, Mr. Conley indicated that many franchisees had asked about the possibility of using their own land for a franchise. Conley deposition at 54. Mr. Conley himself acquired a franchise in 1975. He tried unsuccessfully to persuade McDonald's to allow him to lease property directly from the owner of the property rather than from Franchise Realty. *Id.* at 31.

to purchase only those foodstuffs that met McDonald's specifications and that Coca Cola is the only cola that met those specifications. The current franchise letter agreement requires franchisees to agree to purchase only those foodstuffs that meet McDonald's specifications. Plaintiffs' Exhibit 19, ¶ 5. Although this agreement has only been in its present form since 1977, the license agreement signed by Martino in the early 1960's provides that the restaurant must be operated in accordance with the standards promulgated by the licensor, and that foodstuffs may only be purchased from those suppliers that are approved by McDonald's. Plaintiffs' Exhibit 8, ¶ 8(A), (C). This documentary evidence is enough to convince us that proof of coercion will be classwide. The requirements as to approved sources imposed by McDonald's will be determined by reference to the license and franchise letter agreements, and the resolution of the issue of whether Coca Cola is the only approved cola will apply to the entire class. Because a motion for class certification does not delve into the merits, we need not and should not consider here whether the alleged arrangement regarding supplies would be a *per se* violation of the antitrust laws. *See Eisen v. Carlisle & Jacquelin, supra* 417 U.S. at 177–78, 94 S.Ct. 2140. With respect to the Coca Cola claim, all franchisees are members of the class.

The plaintiffs must also show that the defendant has sufficient market power in the tying product to make the coercion effective as to the tied product. *See United States Steel Corp. v. Fortner Enterprises, Inc., (Fortner II), supra.* The plaintiffs here can avoid demonstrating McDonald's market power in its franchise if the trademark is so unique that market power can be inferred. The court in *Siegel v. Chicken Delight, supra* at 50, extended to trademarks the presumption of market dominance usually accorded only to patents and copyrights. The McDonald's trademark is sufficiently unique for us to presume that the proof of its dominance in the market will be classwide. *See Krehl v. Baskin Robbins Ice Cream Co., supra* at 119–20.

We also hold that both as to the Coca Cola and the real estate claims that a not insubstantial amount of interstate commerce is involved.

The most difficult issue in this motion for class certification is the fact of damage requirement. At the outset of the discussion, we must clarify what the plaintiffs are required to demonstrate here. We are concerned here only with the issue of whether the proof of fact of damage would be common to the class. Plaintiffs need not demonstrate now that fact of damage exists.

Moreover, the fact of damage must be distinguished from actual damages. By their nature, the damages actually suffered by each class member must be determined on an individual basis. A bifurcated trial can be used to determine the individual damage issues separately once liability to the class has been determined. *Halverson v. Convenient Food Mart, Inc., supra* at 335; *State of Illinois v. Harper & Row Publishers, Inc.,* 301 F.Supp. 484 (N.D.Ill.1969). The plaintiff, however, must nevertheless establish fact of damages as part of his proof of liability. *See* Areeda, *Antitrust Violations Without Damage Recoveries,* 89 Harv.L.Rev. 1127, 1128 (1976).

To satisfy the fact of damage requirement, also known as the impact requirement, the plaintiff must show a causal connection between defendant's antitrust violations and plaintiff's injury. *Response of Carolina, Inc. v. Leasco Response, Inc., supra* at 1321. Thus the fact of damage requirement has two aspects: the plaintiff must show first that he suffered some damage and second that defendant's antitrust violations caused the injury. *Presidio Golf Club v. Nat'l Linen Supply Corp.,* 1976–2 Trade Cases ¶ 61,222 at 70,630 (N.D.Cal. 1976). The Supreme Court explained the impact requirement in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977):

Plaintiff must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury

should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violation . . . would be likely to cause." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, [395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).]

Thus in determining whether proof of fact of damage would be classwide, we must first determine whether plaintiffs could introduce classwide evidence demonstrating that the class has suffered some injury and second whether a causal link exists between the class's injury and the defendants' actions.

With respect to the real estate claim, Martino has alleged that the defendants charge a rent for the Manitowoc lease which is 30% above the price Franchise Realty pays the owner of the property. Martino further alleges that Franchise Realty makes similar markups in all of its franchise lease agreements. Plaintiffs then argue that if this is true then we could certainly decide that fact of damage could be demonstrated on a classwide basis. We could presume that McDonald's franchisees, capable businessmen carefully screened by McDonald's, would have been able to buy or lease a site for less than they pay to Franchise Realty. Unlike the *Krehl* case, in which the franchisor extracted an additional $10.00 per month from its franchisees, the alleged markup here would be sufficiently large to obviate the need for individual proof.[7] Given the large markup, we would not need to determine whether an opportunity to obtain the land for less existed in each individual case.

McDonald's, however, argues that individual issues would abound in the determination of fact of damage. Defendants contend that the plaintiffs' allegation of a 30% markup is incorrect, because the amount that each franchisee pays which is designated as "rent" cannot all be attributed to the franchisee's use of the parcel of land underlying the restaurant. The amount designated as "rent" also constitutes consideration for the total package of operating rights, services and assistance which each franchise receives from McDonald's. Each franchisee, in addition to the rent payment, pays a monthly service fee to McDonald's for advertising, public relations, and operational support. This service fee, however, does not adequately cover these services and so part of the "rent" payment goes to compensate McDonald's for the services it provides. Thus defendants argue that whatever was attributable to these services would have to be subtracted from the rent payment in determining the amount attributable to the use of the property. Moreover, defendants claim that each franchisee, to prove injury, would have to prove that he wished to rent from someone other than McDonald's, and that he would have been able to obtain the land on which his franchise is located for less rent or a smaller purchase price than he paid Franchise Realty.

We believe that defendants misconceive the specificity required to prove that the injury element of the fact of damage requirement is classwide. All we need decide in determining fact of damage is that some injury exists.[8] The plaintiffs can attempt

---

7. Plaintiffs, in addition to the evidence regarding Martino's franchise, have submitted as an exhibit Mr. Ray Kroc's book, *Grinding It Out: The Making of McDonald's.* The statements in this book will be admissible against defendants as admissions under Rule 801(d)(2)(D), F.R. Evid. The book indicates that McDonald's made substantial profits from its leasing arrangements. *Id.* at 83.

8. Some courts and commentators have indicated that the proof necessary to satisfy the fact of damage requirement must be more specific and definite than evidence showing the

actual amount of damage. *See, e. g., Terrell v. Household Goods Carriers Bureau,* 494 F.2d 16 (5th Cir. 1974); Areeda, *Antitrust Violations Without Damage Recoveries, supra.* We believe, however, that this additional specificity relates to the causation requirement and not the showing of injury. In *Story Parchment v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931), the Supreme Court explained the difference in certainty of proof required for the fact of damage issue and the proof of actual damages:

The rule which precludes recovery of uncertain damage applies to such as are not the

to prove what the promotional and supervisory support provided by McDonald's is generally worth to a franchisee. If after subtracting this sum the plaintiffs can prove that the rent charged by McDonald's was still substantially higher than what the franchisee would pay to a third party, then the fact of damage requirement would be satisfied. If plaintiffs can prove such a substantial generalized increase, then we could presume that the class members would have wanted to and could have obtained their sites for less rent. We believe that a sufficient basis exists for us to determine that the evidence of some damage would be classwide. As the court in *Bogosian v. Gulf Oil Corp., supra* at 454 stated:

> [A]ny evidence which is logically probative of a loss attributable to the violation will advance plaintiff's case . . .
> [T]here is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual.

This determination would not be as complicated as the fact of damage issue would have been in *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (en banc), in which the plaintiffs were alleging injury resulting from thousands of transactions between several defendants and over 20,000 class members. Moreover in *Windham*, a variety of claims complicated the fact of damage issue. Here the claims of the easily identifiable class members are similar, and each class member would not have to prove liability and damages resulting from a multiplicity of real estate transactions with Franchise Realty. If the plaintiffs here cannot introduce evidence, however, sufficient to convince us that the class as a whole has suffered some injury, then we may exercise our prerogative under Rule 23(c) to decertify the class. As the court in *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), stated:

certain result of the wrong, not to those damages which are definitely attributable to the

Neither the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify a class wrong, is a basis for declining to certify a class which apparently satisfies the Rule.

With respect to the Coca Cola tying claim, plaintiffs have alleged that Coca Cola paid a uniform rebate. In proving that the franchisees, as a class, could have obtained a cola for less than they paid Coca Cola and thus that they were injured, the plaintiffs would have to introduce evidence of the other cola prices that would be applicable to the class. In a similar situation, the *Krehl* court held that proof of fact of damage from an alleged tie of ice cream to a franchise would be classwide. The court reasoned that any seller of ice cream able to compete with the defendant, Baskin Robbins, would have to be able to compete as to regions. *Krehl v. Baskin Robbins, supra* at 120. Similarly, in the instant case any cola manufacturer able to compete with Coca Cola in sales to McDonald's would have to be able to compete as to regions. Even if the proof is of pricing as to relatively small areas, the proof of fact of damage would not be too burdensome, given that we are dealing with a single product, which is likely to have relatively stable, easily identifiable prices. *See id.* Once again, if plaintiff cannot introduce enough classwide evidence to convince us that the Coca Cola requirement injured the franchisees, we may decertify the class.

The proof of the causation element of the fact of damage requirement for both the real estate and cola claims will be classwide. Courts often presume the causation element in certifying classes in horizontal price-fixing cases. Once a class member in such a case has proved that he purchased from the defendants, who fixed supracompetitive prices, then the class member has suffered damage the causation of which may be presumed. *See, e. g. City of Philadelphia v.*

wrong and only uncertain in respect of their amount.

*American Oil Co.,* 53 F.R.D. 45 (D.N.J.1971); *In re Antibiotic Antitrust Actions,* 333 F.Supp. 267 (S.D.N.Y.1971); *In re Master Key Antitrust Litigation,* 70 F.R.D. 23 (D.Conn.1975). Similarly, in a tying claim, unlike other antitrust cases such as monopolization or territorial restriction cases, *see San Antonio Telephone Co. v. American Telephone & Telegraph Co.,* 68 F.R.D. 435 (W.D.Tex.1975), the causation of plaintiff's damages is clear. *See id.* Once the plaintiff shows that he was injured because he could have purchased the tied product for less elsewhere, the causation of the plaintiff's injury is clear. This conclusion is especially true in those tying cases, such as this one, in which the plaintiffs would have purchased the tied item elsewhere if they did not purchase it from the defendant. If the defendant forces the plaintiffs to take an item that the plaintiffs might not have purchased anywhere absent defendant's coercion, the causation of plaintiff's damage is not so clear. *See Olmstead v. Amoco Oil Co.,* 1977–1 Trade Cases ¶ 61,487 (M.D.Fla. 1977). But because McDonald's franchisees need to lease or own property and to buy cola, the causation element here is clearly subject to classwide proof.

██ Because the issues of coercion, market power, and fact of damage will be classwide, we hold that common questions of law and fact predominate. Moreover, given the large size of the class, and the expense in conducting an antitrust action, a class action is the superior method of proceeding here. *See Gold Strike Stamp Company v. Christensen,* 436 F.2d 791 (10th Cir. 1970); 7A C. Wright and A. Miller, *Federal Practice and Procedure,* § 1779 at 60 (1972). Thus we certify this action as a class action under Rule 23(b)(3) for liability issues. Damages will be determined on an individual basis if liability is found. The plaintiffs will proceed with two classes. The first, relating to the real estate claim, consists of all franchisees who acquired a McDonald's franchise after McDonald's established the policy of requiring franchisees to lease from Franchise Realty. The second class, relating to the Coca Cola claim, consists of all franchisees. Cause is set for report on status on February 14, 1979 at 9:30 a. m.