Josephine VARGAS, Martin Ellerbee, Marion Gargiulo, Joann Wheeler, Janice Sellers, Maria Rivera, Margarita Gonzalez, Plaintiffs,

v.

Christine CALABRESE, Frank Caleca, Lee S. Lichtenberger, Julius D. Canter, as Members of the Hudson County Board of Elections; Joseph T. Brady, as Hudson County Superintendent of Elections; Gerald McCann; Anne Pappalardo, as District Board Member, Ward A, Joseph Russo, as District Board Member, Ward B, Katherine O'Connell, as District Board Member, Ward C, Muriel DiBello, as District Board Member, Ward D, Walter Kierce, as District Board Member, Ward E, William Wolfe, as District Board Member, Ward F, individually and on behalf of all District Board Members employed at the Jersey City June 11, 1985 election; Joseph Devine, Mary Paterno, Challengers, Ward A, Dennis Costa, Mildred Napolitano, Challengers, Ward B, George Dolan, June Bravo, Challengers, Ward C, Mark Pica, Elizabeth Ranelli, Challengers, Ward D, Juan Rosario, Yolanda Rivera, Challengers, Ward E, Phil Flood, Flossie Thompson, Challengers, Ward F, individually and on behalf of all Challengers used by candidate, Gerald McCann, at the Jersey City, June 11, 1985 election, Defendants.

Civ. A. No. 85–4725.

United States District Court, D. New Jersey.

May 14, 1986.

Lawyers' Committee for Civil Rights Under Law by Samuel Issacharoff, Patricia M. Hanrahan, Washington, D.C., Puerto Rican Legal Defense & Educ. Fund, Inc. by Juan Cartagena, New York City and American Civil Liberties Union of New Jersey by Lauren Anderson, Newark, N.J., for plaintiffs.

Margulies, Margulies & Wind by Robert E. Margulies, Jersey City, N.J., for defendants Christine Calabrese, Frank Caleca, Lee S. Lichtenberger, and Julius D. Canter.

Klinger, Nicolette, Mavroudis & Honig by Allan H. Klinger, Hackensack, N.J., for defendant Joseph T. Brady.

Joseph Healy, Jersey City, N.J., for defendant Gerald McCann.

W. Cary Edwards, Atty. Gen. of New Jersey by Donna Kelly-Boccher, Asst. Atty. Gen., Trenton, N.J., for defendant-intervenor.

## OPINION

DEBEVOISE, District Judge.

Plaintiffs Josephine Vargas, Martin Ellerbee, Marion Gargiulo, Joann Wheeler, Janice Sellers, Maria Rivera, and Margarita Gonzalez, seven registered voters of Jersey City, seek declaratory relief and monetary damages on behalf of a proposed class of all registered black and Hispanic voters in Jersey City for alleged discrimination against minority voters during the June 11, 1985, municipal run-off election. Defendants are Christine Calabrese, Frank Caleca, Lee Lichtenberger, and Julius Canter, members of the Hudson County Board of Elections; Joseph Brady, Hudson County Superintendent of Elections; Ex-mayor of Jersey City and mayoral candidate Gerald McCann; six named District Board members individually and on behalf of all District Board members; and twelve named challengers individually and on behalf of all McCann challengers.[1]

Plaintiffs allege violation of the First, Fourteenth, and Fifteenth Amendments to the United States Constitution; the Voting Rights Act of 1965, as amended 42 U.S.C. Section 1971 *et seq.;* and the Civil Rights Act of 1866, 42 U.S.C. Sections 1983, 1985, 1986, and 1988.

Plaintiffs move for certification of plaintiff and defendant classes and partial summary judgment on Counts One through Thirteen of their First Amended Complaint. Intervenor W. Cary Edwards, the Attorney General of New Jersey, cross moves for summary judgment on the challenged Constitutionality of four New Jersey election laws. Defendants Board of Elections Chairperson Calabrese, and Board members Caleca, Lichtenberger, and Canter move for discovery on the issue of certification of a plaintiff class.

*Prior Proceedings*

On October 8, 1985, plaintiffs filed a motion for preliminary injunctive relief against defendant Hudson County election officials to compel them to protect the voting rights of minority voters in the upcoming Gubernatorial Election. On October 18, 1985, after a hearing, I signed a consent order specifying election procedures agreed to by the parties. At a hearing on December 22, 1985, I dismissed defendant McCann's counterclaims for indemnity from third party defendant Hudson County Democratic Party and the City of Jersey City. I also granted the motion of the

---

1. Subsequent to argument on the motions considered here, plaintiffs filed a notice of dismissal as to named challengers and district board members.

Attorney General of the State of New Jersey to intervene in his own behalf.

*Facts*

Plaintiffs and defendants present divergent descriptions of the events leading up to the June 11, 1985 Jersey City municipal run-off election and of the events that transpired during the election. Top-vote getting mayoral candidates Anthony R. Cucci and incumbent Gerald McCann campaigned vigorously but neither captured more than 50% of the votes cast in the May 14, 1985 general election as required to win the mayoral race without a run-off election.

Plaintiffs contend that Mr. Cucci received substantial support in black and Hispanic neighborhoods, particularly in Ward E-Downtown and Ward F-Bergen Lafayette. Plaintiffs allege that candidate McCann responded to this perceived threat by attempting to interfere with the voting rights of residents from targeted black and Hispanic neighborhoods. Specifically, plaintiff's allege that Mr. McCann and his supporters instigated the following abuses:

1) Forwarding letters to residents of public housing projects tenanted by blacks and Hispanics informing them that unless their names appeared on their apartment leases they would be unable to vote and would be prosecuted for doing so. There was also a letter to residents of the A. Harry Moore Public Housing Project signed by City Housing Manager Rev. Robert Blount. Elevators at two high rise public housing buildings were vandalized on the day of elections, preventing egress from the buildings until the afternoon. Affs. of Maria Rivera and Sharon Rivenson Mark.

2) Placing some 5,000 to 6,000 names on the Challenge List by Superintendent of Elections Joseph Brady without notification to these voters. Some of the listed individuals claim to have received sample ballots at their homes, contrary to Superintendent Brady's assertion that names were placed on the list because sample ballots mailed to their listed residence were returned as undeliverable. Affs. of Joanne Wheeler, Donald Silberman, Josephine Vargas, and Joan Walrod.

3) Substituting, at the request of Mr. McCann, off-duty Jersey City police officers who supported McCann for experienced district board members in districts with large numbers of minority voters. These substitutions were carried out pursuant to the authority of Board of Elections members Calabrese, Caleca, Lichtenberger and Canter. On at least two occasions off duty police officers were alleged to have intimidated voters by displaying their firearms. Aff. of Glen Cunningham.

4) Requiring, per instructions of Superintendent Brady contained in a notice to district board members, without advance notice to voters or training of challengers, that "any voter who is on the challenge list, or challenged at the polls" [would be prevented from voting unless he/she produced] "current telephone bills, current evidence that they actually reside at their registered address. A drivers license *alone is not* sufficient proof of current residency. These voters should also be required to produce current telephone bills, current gas and electric bills or current unaltered rent receipts." Aff. of Joseph Brady, Exh. B, Memorandum to District Board Workers.

5) Requiring as per instructions contained in a letter from Board of Elections Chairperson Calabrese to District Board members that all persons appearing on the peremptory challenge list must obtain a court order to vote. It was further required that:

"In addition to the peremptory list, every district will have a number of voters whose sheets will have a challenge affidavit attached to it. These voters are not to be allowed to vote unless they produce sufficient evidence of current residence at the address listed on the voters' sheet. A driver's license alone is *not* acceptable proof of current residency. These voters should be required to produce at least *two* of the following:

1. *Current months* telephone bill

2. *Current months* gas and electric bill

3. *Current months* rent receipt or current quarter tax bill."

However, the letter goes on to indicate that even the above may not be satisfactory. It states: "the board members should then vote on whether the proof presented is *sufficient* to allow the person to vote." Also noteworthy is the failure to provide any instructions regarding providing information to denied voters on the procedure for petitioning the State courts or Superintendent Brady's office for an order to vote. Plaintiffs' Amended Complaint, Exh. A.

6) Preparation of color-coded lists of names by the McCann campaign which were used to challenge prospective voters on the basis of race. Aff. of Sharon Rivenson Mark Paragraph 14; Margaret Hart Paragraph 4, and Donald Silberman, Paragraph 5.

7) Inadequate bilingual assistance at the courthouse and polling places to assist Hispanic voters. Aff. of James Monson and Margaret Hart.

As a result of the challenge lists and challenge process plaintiffs allege that black and Hispanic voters were harrassed, challenged by McCann challengers without cause, and required to obtain a court order to vote because of their race.

Gerald McCann presents a different version of the facts. He contends that widespread fraud occurred during the May 14, 1985 elections including voting by "dead people" and voters giving their residences as nonexistent houses, empty lots, and warehouses. McCann Aff. Paragraph 3. McCann also alleges that residents from certain named public housing projects engaged in fraudulent voting. *Id.* at Paragraph 4. McCann asserts that he notified Superintendent Brady of these irregularities. He also had his own campaign workers investigate fraud resulting in the securing by his campaign workers of district sheets and the designation of suspect addresses and potential McCann votes. Anthony Lambiase, McCann campaign coordinator, explains in his affidavit that McCann campaign workers obtained copies of district sheets from the Board of Elections to identify "locations from which people voted illegally." Mr. Lambiase states that McCann campaign workers marked the sheets with various color markers to designate empty buildings and lots. He denies that these sheets were used to designate race, color, or ethnic origin. Lambiase Aff. Paragraph 3.

Defendants Calabrese, Lichtenberger, Caleca and Canter of the Hudson County Board of Elections deny any wrongdoing or violation of state or federal laws. In particular they disavow any impermissible motive in the appointment of police officers as district board members. They point to a June 10, 1985 order of Assignment Judge Humphreys of the New Jersey Superior Court permitting Jersey City police officers to act as District Board Members. They state that once Judge Humphreys had ruled "we accepted it and took no further action in that regard. We were represented and relied upon the advice of David Dembe, Deputy Attorney General in this matter." Calabrese *et al.* aff. Paragraph 6.

Defendant Calabrese argues in her brief, that her memorandum to district board members was promulgated in her capacity as Chairperson of the Board of Elections. She further states that the voter identification requirements only pertained to those individuals who had a challenge affidavit attached to his or her voting sheet and that an affidavit would not have been attached unless the sample ballot was returned as undeliverable to the listed residence. Brief of Defendant Calabrese *et al.*, p. 3.

Superintendent Brady's affidavit sets forth the basis on which the peremptory order list and the challenge list were prepared for the June 11, 1985 election. Any person on the peremptory order list had a pink sticker attached to his or her voter registration sheet and was required to obtain a court order to vote. Any one on two previous challenge lists who failed to vote in those elections was placed on the peremptory order list. Names were placed on

the challenge list if sample ballots mailed in advance of the May 14, 1985 municipal elections were returned by the post office as undeliverable as addressed. Names were stricken from the list if a person submitted a new registration or a residence transfer award form. An affidavit was attached to the registration sheet of each person on the challenge list for signature if his or her residence was appropriately established. Brady Aff. Paragraphs 6, 7, 9.

Superintendent Brady, while denying any individual discriminatory actions, points to serious problems which arose during the June 11, 1985 run-off election. He specifically draws attention to the following:

1) McCann campaign workers complained to Superintendent Brady that in the May election voters claimed empty lots and boarded up buildings as residences, and the names of people who had died were being used by voters. It was further claimed that a Mailorama mail drop in Jersey City was being used as a residence. Brady Aff., Paragraph 10.

2) On June 11th Mr. Brady states he received a call from United States District Court Judge Ackerman in reference to complaints of interference with voting brought by an attorney, Mr. Porro. Mr. Brady reports that he stated to Judge Ackerman "that it appeared that some district board workers were demanding too much by way of identification at the polls." Mr. Brady indicated that he and Judge Ackerman reached agreement as to the following:

"Where a person was on [Superintendent Brady's] challenge list, two items of identification would be sufficient, one of which could be the driver's license; but where the challenge was made by a challenger or a district board worker, one piece of identification, which could be the driver's license, would suffice."

Mr. Brady states that in accordance with Judge Ackerman's order he attempted to get this information to polling places as soon as possible by communicating it to Joseph Healy, then Jersey City Corporation Counsel, and now counsel to defendant McCann in the instant action. Mr. Healy agreed to forward this information to each polling site by using the police communications system to contact the uniformed officer on duty at each polling place. *Id.* Paragraph 16.

3) Superintendent Brady further states that he logged in many complaints throughout the day on June 11, including refusal by district boards to honor court orders, observations of a gun carried by an off duty police officer serving as a district board member, and fights among district board members. *Id.* Paragraph 19.

4) Superintendent Brady also describes a letter which he states was presented only in draft form by Ms. Calabrese for his review. The letter was addressed to district board members and concerned required forms of voter identification. He contends he did not see the final form of the letter until the afternoon of June 11 and that the letter was never approved by the Board of Elections. *Id.* Paragraph 25(a).

The seriousness with which it appears that Superintendent Brady took the complaints of interference with voting rights is indicated by his statement to a reporter that he intended to mail out a 27 question form to all district board workers inquiring about voter harassment and intimidation by local board members and challengers including plainclothes police officers, interference with individual's right to vote, and display of guns at the polling places. McCann Aff., Exh. B, *Hudson Dispatch,* 8/20/85.

Nevertheless, Superintendent Brady disputes many of the factual assertions of the plaintiffs and argues that he has no duty or authority to provide bi-lingual assistance at polling sites. *Id.* Paragraphs 28, 29, 32.

Defendant District Board Members are unrepresented and have not answered the complaint or responded to the instant motions. Similarly defendant McCann challengers have not answered the complaint. Several of these individuals, however, have written letters to the court. Mildred Na-

politano, a McCann challenger, states she was a challenger at Ward B, District 4 from 4 to 8 P.M. She states that she did not challenge any voters. District Board Members William Wolfe and Walter Kierce state in their letters that they are appearing *pro se* and deny all allegations. McCann challenger Dennis Costa presents a sworn statement to the court averring that he challenged no voters during the election.

*Discussion*

1. *Defendants' motion for discovery on the issue of certification of a plaintiffs class*

■ Defendants Calabrese *et al.* joined by defendant McCann move for discovery to determine if this case concerns only a few more voters than the named plaintiffs or hundreds of voters. In particular, defendants seek discovery on whether plaintiffs undertook to solicit class members and the results of such solicitation. Under appropriate circumstances discovery on the merits of class certification has been permitted by the courts.

> There can be no doubt that it is proper for a district court, prior to certification of a class, to allow discovery and to conduct hearings to determine whether the prerequisites of Rule 23 are satisfied.... Indeed a district court may be reversed for premature certification if it has failed to develop a sufficient evidentiary record from which to conclude that the requirements of numerosity, typicality, commonality of question, and adequacy of representation have been met.

*Sirota v. Solitron Devices, Inc.* 673 F.2d 566, 571 (2d Cir.1982). However, in the instant case I have adequate information before me to allow consideration of the factors required to determine the appropriateness of class certification.

> "Enough [has been] laid bare to let the judge survey the factual scene on a kind of sketchy relief map, leaving for later view the myriad of details that cover the terrain."

*Professional Adjusting Systems of America, Inc. v. General Adjustment Bureau, Inc.*, 64 F.R.D. 35, 38 (S.D.N.Y.1974).

The trial court is obligated to determine if a class action is maintainable "[a]s soon as practicable after the commencement" of the action, Fed.R.Civ.P. 23(c)(1). I will therefore proceed to do so on the record before me. Defendants' motion for discovery on the issue of plaintiffs' class certification is denied.

2. *Certification of a Plaintiff's Class*

Fed.R.Civ.P. 23(a) contains the preliminary requirements for maintenance of a class action as follows:

> "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Plaintiffs request certification of four classes of plaintiffs in their amended complaint:

Class I is defined as all qualified black and hispanic voters in Jersey City who were required to produce several different forms of identification in order to vote. Plaintiffs aver that this class is comprised of, upon information and belief, 1500 to 3,000 black and Hispanic voters. Plaintiffs' Amended Complaint, Paragraph 16.

Class II is defined as all qualified black and hispanic voters who were not permitted to vote at the polling place and as a result did not cast a vote. Plaintiffs aver that this class is comprised of 150 to 1000 members. *Id.* Paragraph 17.

Class III is defined in the same way as Class II except that these individuals successfully voted only after receiving an order from the Hudson County Superior Court. Plaintiffs aver this class is com-

prised of approximately 250 members. *Id.* Paragraph 18.

Class IV is made up of those voters whose ability to vote and participate in the elections was impaired by the failure to provide Spanish language assistance. *Id.* Paragraph 19.

For purposes of voting, the City is composed of six election wards, A through F. Ward A, is approximately 22% black and 10% Hispanic. Ward B, West Side, is approximately 25% black and 15% Hispanic. Ward C, Journal Square is approximately 5% black and 23% Hispanic. Ward D, the Hudson City section, is 22% Hispanic and less than one percent black. Ward E, Downtown, has a plurality of Hispanic residents: 44% Hispanic and 27% black. Ward F, Bergen Lafayette, is 86% black and approximately 6% Hispanic. First Amended Complaint, Paragraph 27.

Plaintiffs claim that as named plaintiffs they meet all of the prerequisites of Rule 23(a) on behalf of a class of "all black and Hispanic registered voters who were duly registered and eligible to vote on June 11 but, because of the actions of defendants, were harrassed, intimidated, delayed and, in many instances denied the right to vote." I will determine if the class as delineated by plaintiffs meets each of the factors enumerated in Rule 23(a).

■ a. *Numerosity.* The first requirement is that the class must be so numerous that joinder of all members is impracticable. Plaintiffs argue that because defendants failed to keep any records of persons challenged at the polling site it is impossible to determine the precise number of minority voters whose voting rights were violated. However, plaintiffs estimate that the proposed class exceeds several hundred, if not thousands. News reports indicate that out of 316 challenged voters who applied to the Superior Court for an order to vote 256 were granted such orders. Hudson Dispatch article, Aug. 20, 1985, McCann Aff. Exh. B. This number does not allow projection to the number of individuals who, as a result of challenges, became discouraged and simply did not vote.

Nor does it address individuals who may have been discouraged from attempting to vote at all. Plaintiffs do not know that exact number in the plaintiffs' classes. Nevertheless, the numbers are clearly large enough to satisfy the requirement of numerosity.

"While there are exceptions, numbers under twenty-one have generally been held too few. Numbers between twenty-one and forty have evoked mixed responses and again, while there are exceptions, numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement."

3B J. Moore, *Moore's Federal Practice,* Paragraph 23.05[1] at 23–150 (2d ed. 1982) (footnotes omitted).

■ It is not necessary, as argued by defendants, that plaintiffs know with certainty the size of class they seek to have certified. What must be shown and has been demonstrated here is that the class is so large as to make joinder impracticable. The State suggests in its brief that it would be more appropriated, based on affidavits submitted by plaintiffs, to certify only minority voters in Wards E and F, where minority voters predominantly reside rather than permit city wide certification. I decline this suggestion. Substantial numbers of minority voters reside in all of the wards of Jersey City and if their rights were impinged upon they are also entitled to redress.

■ b. *Commonality.* This prerequisite requires only that there be *some* questions of law or fact common to the class. It is not necessary that all the factual or legal issues raised by the case concern each class member. 7 C. Wright & A. Miller, *Federal Practice & Procedure* Section 1763 at 603 (1972). In the present case plaintiffs contend that there was a "concerted effort to dilute the minority vote." This assertion lies at the heart of this case and affects each class member. The Supreme Court has recognized that suits alleging racial or ethnic discrimination "are often by their very nature class suits, in-

volving classwide wrongs...." *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 405, 97 S.Ct. 1891, 1898, 52 L.Ed.2d 453 (1977). See *Gurmankin v. Costanzo*, 626 F.2d 1132 (3rd Cir.1980). I therefore find that the second prerequisite to class certification is met.

c. *Typicality.* The Third Circuit has adopted the test for typicality advanced in 7 Wright and Miller, *supra* Section 1763 at 614. *Weiss v. York Hospital*, 745 F.2d 786, 806 n. 36 (3rd Cir.1984).

> "... [P]laintiff has satisfied Rule 23(a)(3) if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory. Of course, when this is true the standard under subdivision (a)(3) is closely related to the test for the common question prerequisite in subdivision (a)(2). On the other hand, Rule 23(a)(3) may have independent significance if it is used to screen out class actions when the legal or factual position of the representatives is markedly different from that of other members of the class even though common questions of law and fact are raised."

Plaintiffs argue that this case meets the requirement of typicality because the class representatives' claims arise from the same practice and course of conduct that forms the basis of the claims of the class. Furthermore, plaintiffs assert that the same legal theories inform the class representatives' claims as well as the classwide claims. *International Molders & Allied Workers Local 164 v. Nelson*, 102 F.R.D. 457, 463 (N.D.Cal.1983).

■ In opposition, defendants argue that the alleged misconduct involved isolated incidents, which occurred under different factual circumstances and therefore would be better resolved on a case by case basis. I find no merit in this argument. If in fact instructions promulgated by the Board of Elections encouraged or permitted harrassment of minority voters through the challenge process by the demand of unnecessarily duplicative identification, then plain-tiffs as a class have a claim against the named defendants. Furthermore, if challengers and district board members engaged in concerted impermissible racial discrimination in their handling of challenges then this again would have harmed plaintiffs as a class.

■ d. *Adequacy of Representation.* The final requirement of Fed.R.Civ.P. 23(a) is that the representative party will fairly and adequately protect the interests of the class:

> "Adequate representation depends on two factors: (a) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation and (b) the plaintiff must not have interests antagonistic to those of the class."

*Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239, 247 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Plaintiffs are represented by three public interest organizations: Puerto Rican Legal Defense and Education Fund, Lawyers Committee for Civil Rights, and the American Civil Liberties Union of New Jersey. Each of these organizations has unassailable credentials and expertise in the litigation of complex civil rights claims, including voting rights cases. As to the interests of the named class members, it appears that they seek redress for the alleged racial and ethnic discrimination they claim. The relief they seek is identical to that sought on behalf of the class as a whole and no conflict of interest is discernable.

If the four requirements of Rule 23(a) are met the court must next determine if the action fits within one of the three categories listed in Rule 23(b).

■ Plaintiffs claim that they fall squarely within categories (b)(1) and (b)(2). They argue that particularly where classwide remedies and damages are sought, the requirements of 23(b)(1) are satisfied. Plaintiffs further point to the comment of the drafters of the federal rules describing

this type of case as an example of a (b)(2) case:

> "Illustrative of (b)(2) cases are various actions in the civil rights field where a party is charged with discriminating unlawfully against a class."

Notes of Advisory Committee on Rules—1966 Amendments, 39 F.R.D. 69, 102 (1966). I agree with plaintiffs that the requirements of both 23(b)(1) and (b)(2) are met.

■ Plaintiffs correctly observe that Rule 23(c)(4) permits the court great latitude in structuring the bounds of the classes it certifies. In the instant case I find it unnecessary to subdivide the class into four parts as requested by plaintiffs. For ease of administration I will define the class as all black and Hispanic residents of Jersey City who were duly registered and qualified to vote on June 11, 1985, whose right to vote in the June 11, 1985 election was interferred with because of their race or national origin, or candidate preference. If future developments in the case suggest a need for subclasses they can be established at a later date.

### 3. *Certification of a Defendants Class*

Plaintiffs seek certification of two classes of defendants: all district board workers employed throughout Jersey City on June 11, 1985 and all McCann challengers employed then. Plaintiff claims that each member of the proposed defendant classes conspired against the black and Hispanic voters of Jersey City to deny them their voting rights. Pursuant to N.J. S.A. Section 19:6-1, each of Jersey City's 173 election district boards consist of a minimum of four and a maximum of six members per District Board. Therefore the proposed class of district board members consists of at least 692 members. The second proposed defendant class consists of all challengers for candidate Gerald McCann. Pursuant to N.J.S.A. 19:7-2, each candidate for public office may appoint two challengers for each election district for a total of approximately 356 persons.

Rule 23 provides no provisions specifically addressed to certification of defendant classes. Nor is there an advisory committee commentary on the certification of defendant classes. This would seem to indicate that the prerequisite requirements discussed in the previous section on plaintiffs class certification would be applied in the same way to certification of a defendants class. However, in practice this is not the situation.

> ... A defendant class action focuses on common defenses and typical defenses, rather than common claims and typicality of claims that concern plaintiff classes. In addition, rather than have a self-appointed champion of absent members of a plaintiff class to serve as a class representative, adequacy of representation in a defendant class must exist through an unwilling class representative chosen by a litigation adversary.

1 *Newberg on Class Actions* Section 4.45 Defendant Classes, p. 372 (1982 ed).

■ Plaintiffs bear the burden of demonstrating the proposed classes meet the criteria of Fed.R.Civ.P. 23. 4 *Newberg on Class Actions* 4, Section 7985, p. 1327 (1977). Plaintiffs in the instant action argue that each of the prerequisites of 23(a) are met in the proposed defendant classes. Plaintiffs assume that the criteria of numerosity and met by their calculation of 642 district board members and 356 McCann challengers.

Commonality of defendants is defined by plaintiffs to exist as to defendants failure to prevent violation of plaintiff's right to vote free of racial and ethnic discrimination and in their interest in defending the challenged state election statutes.

Typicality is asserted because there are "types of facts or evidence typical of the class." *Doss v. Long,* 93 F.R.D. 112, 117 (N.D.Ga.1981). Finally, plaintiffs claim that adequacy of representation is satisfied because each of the named representatives can be shown to have a substantial interest in the outcome of the litigation and is represented by able counsel.

The State raises several substantial arguments in opposition to plaintiffs motion for certification of two defendant classes. The State first observes that a factual inquiry into the existence of a conspiracy to deprive black and Hispanic voters of their rights raises questions as to the intent, knowledge and conduct of each individual in the proposed defendant classes thus negating the requirement of typicality. *Rios v. Marshall,* 100 F.R.D. 395 (S.D.N.Y.1983). Even more cogently the State argues that the interests of the named defendants may be antagonistic to the other proposed class members. Several class members state in their letters to the court that they have done no wrong. They may next argue that it was other members of the proposed classes that engaged in impermissible racial and ethnic discrimination.

Further evidence of the inability of the named defendant class representatives to adequately protect the interests of class members is demonstrated by their failure to engage counsel and yet appear in this action to answer the claims against them.

■ I conclude that plaintiffs have failed to meet the requirements of Fed.R. Civ.P. 23 in their motion for certification of a defendants class. I note that plaintiffs have described individuals in their complaint who they allege actively denied plaintiffs their right to vote on the basis of race and ethnicity. It will not be unduly burdensome for plaintiffs to amend their complaint to assert causes of action against these individuals. For example, plaintiffs name at least 16 Jersey City police officers who were appointed to replace 16 experienced District Board members. Amended Complaint Paragraphs 48–52. Plaintiffs claim these police officers were placed in election districts containing significant numbers of black and Hispanic voters. *Id.* Plaintiffs also describe specific incidents involving reports of police officer district board members who exhibited their firearms and otherwise intimidated voters. *Id.* Paragraphs 110–112. Defendants in this action have made part of the record the names of district board members for the June 11 election and plaintiffs will be able to identify the names of individual board members and which board members were police officers. 2/11/86 Certif. Maria Klein.

■ Of particular importance to my denial of plaintiffs motion for certification of defendants classes is the well settled proposition that "adequacy of representation is the quintessence of due process in class actions." 1 *Newberg on Class Actions, supra,* at p. 376 citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). In a defendant class action, "assurance of typicality of defenses and a vigorous defense of the common issues are central to adequate representation." *Id.* Neither of the above factors are satisfied by the proposed defendant classes.

I also note the chilling effect upon the legitimate exercise of political rights which would result from the certification of a class of defendants consisting of challengers or election board members. Persons serving in such capacities are usually volunteers or receive very small remuneration. They are exercising important constitutional rights to participate in the election process. If persons exercising their rights are subject to the risk of becoming defendants in class actions they might well be inhibited from participating in the election process at all. Thus, the plaintiffs in the present case, who seek to protect their own voting rights, would be opening the doors to the deprivation of the constitutional rights of others. This, of course, cannot be permitted. This risk is so serious, that I shall adopt special procedures in this case to ensure that the defendant challengers and District Board members joined as parties in this case can assert their defenses with a minimum of expense and difficulty. Most are undoubtedly people of modest means. They are confronted with a lawsuit funded and litigated by organizations having extensive resources and superior legal talents. If they have unlawfully deprived plaintiff class of their rights, appropriate remedies must be provided. However, if they were simply exercising their

rights to oppose the candidates plaintiffs espoused they must not be crushed by the burden of this complex lawsuit. I shall set forth in another context the steps which will be taken to avoid this unintended consequence of this action.

Plaintiff's motion for certification of defendant classes will be denied.

### 4. *Motions for Partial Summary Judgment II, III, IV, V, and VI*

Plaintiffs move for summary judgment against defendants for violations of 1) the First Amendment, 2) the Voting Rights Acts of 1965 and 1957, 3) the Civil Rights Act of 1866, 42 U.S.C. Section 1985, and 4) the Fourteenth and Fifteenth Amendments.

■ In order to prevail on a motion for summary judgment, the moving party must prove that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A motion for summary judgment may only be granted if there are no remaining issues of material fact which, if believed by the trier of fact, would justify a finding for the party opposing that judgment. *Bryson v. Brand Insulation, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Wahl v. Rexnord*, 624 F.2d 1169, 1181 (3d Cir.1980). However, the opposing party may not rest upon the mere allegations or denials of his pleadings, but his response must set forth specific facts showing a genuine issue for trial. *Delong Corp. v. Raymond International, Inc.*, 622 F.2d 1135, 1139 (3d Cir. 1980). More than "metaphysical doubt" as to the material facts must be put forward to demonstrate the existence of a genuine factual issue. *Matsushita Electric Industry Co. Ltd. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

■ In the present case, the affidavits submitted present numerous factual issues which preclude summary judgment. Specifically defendants deny they had the requisite intent to be held liable for the above violations. Thus, plaintiffs' motions for summary judgment must be denied.

### 5. *Constitutionality of Challenged New Jersey Election Statutes*

Count One of the complaint challenges New Jersey State Election Laws, N.J.S.A. 19:7-5, 19:15-18, 19:15-22 and 19:15-24, as violative of the First Amendment. Plaintiffs argue that these laws permit unlimited discretion to district board members and challengers and allow unnecessary and burdensome restrictions on access to political expression through the franchise and the right of association. Count Two alleges that these same laws permit District Board members and challengers such discretion that plaintiffs were deprived of a liberty interest without due process of law. Count Six of the Complaint asserts that the challenged laws violate Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. Section 1973. Plaintiffs First Motion for Partial Summary Judgment seeks judgment on the above counts.

■ A. *State Elections Laws:* The tenth amendment expressly reserves to the states the power to regulate elections. *Oregon v. Mitchell*, 400 U.S. 112, 124–126, 91 S.Ct. 260, 264–266, 27 L.Ed.2d 272 (1970). New Jersey's voting laws extend back to the state constitution of 1776 which permitted all inhabitants of the colony of full age, who were worth fifty pounds to vote. N.J. Art. LI (1776).[2] In 1844 New Jersey adopted a new Constitution, which restricted suffrage to white male citizens of the age of twenty-one. N.J. Const. Art. II, Section 1 (1844). Paupers, idiots, insane persons, and those convicted of certain crimes were denied suffrage. *Id.* It was not until 1875 that the state constitution was amended to eliminate the racial qualifi-

---

2. Judge Gibbons Summarizes the history of the franchise in New Jersey in *Stephens v. Yeo-*

*mans,* 327 F.Supp. 1182 (D.N.J.1970).

cation. N.J. Const. Art. II, Section 1 (amended 1875). Finally, in 1920 women were permitted to vote after passage of the nineteenth amendment to the United States Constitution.

New Jersey's present constitution, adopted in 1947 and subsequently amended, permits United States citizens 18 years or older to vote in state elections. N.J. Constitution Art. 2 Paragraph 3. As in prior provisions, idiots, insane persons, and persons convicted of crimes designated by the legislature are denied the right of suffrage. *Id.* Paragraphs 6, 7.

Prior to the enactment of the 1947 Constitution, the New Jersey legislature promulgated a comprehensive statutory scheme in the 1930's to govern elections. An Act to Regulate Elections Revision (1930) (L.1930 C. 187 p. 671). A number of these provisions, including the provisions challenged by the plaintiffs, remain in effect. Of the four sections challenged by the plaintiffs, only N.J.S.A. 19:7-5, governing challengers has been substantially amended since 1930.[3]

As provided in the state constitution, each person who is 18, resides in the district in which she or he expects to vote, and who is a citizen of the United States may register to vote provided that the individual is not disqualified due to idiocy, insanity or due to serving a sentence or being on parole or probation as the result of a conviction for an indictable offense. N.J.S.A. 19:31-5, 19:4-1.

When a person approaches the polls and attempts to vote, either a challenger or district board member may question an individual regarding his qualifications or disqualifications. *N.J.S.A.* 19:15-18 states:

> The members of the district boards and any duly authorized challenger, respectively, shall at any election challenge every person who shall claim to have a right to vote therein whom they or he shall know, suspect or believe not to be qualified or entitled to so vote, and said members of the district board or challenger shall have the power and right to ask all necessary questions to determine such person's right.

According to *N.J.S.A.* 19:15-22:

> Upon any question or challenge of a voter duly registered it shall be the duty of the board, and the privilege of all its members, to put all such questions as are

---

**3.** N.J.S.A. 19:15-24 has been amended to reflect changes in the design of poll books and court nomenclature. I note that a series of legislative reports on the need for proposed revisions of New Jersey's election laws are available in the state documents section of Rutgers Law School Library. *See,* e.g., December 1, 1970, March 25, 1975 and December 19, 1978 Reports on Election Law Revisions. Neither party has referenced these materials. For example, the 1978 hearings on proposed revisions to the election law contain testimony by Joyce Davis, Director of the League of Women Voters Election Law Reform Committee, describing repeated unsuccessful attempts to amend New Jersey election law. The subject is one that has concerned the League for the past 25 years and a succession of state legislative committees for two decades. The last comprehensive revision in 1930 revamped a twenty-one year old statute adopted in 1909. The League describes elections in New Jersey as "still laboring under a half century old statute barnacled with such a weight of amendments, accretions and clarifications that it has grown ... with enough ambiguities to insure fresh spates of litigation before and after every election.... Still Title 19 creaks along, bewildering voters, candidates, lawyers, and election

workers; overburdening the coyrts; and making a substantial contribution to the apathy and cynicism which plague our entire elective process." The 1978 bill is described as having been arrived at with "no untimely haste." The first bill proposing substantial revisions w introduced twenty years ago and never acted upon. In 1965 a new bipartisan Election Law Revision Commission began its work. In 1974 and 1975 proposed bills were never moved. The League concluded its testimony with the observation "that bad election law breeds corruption in government." *Public Hearing on A-744 (Proposed Title 19A-Election Law)* before Assembly State Government, Federal and Interstate Relations and Veterans Affairs Committee, Dec. 19, 1978 at pp. 6A-8A. Various proposed revisions would require training of district board members and permitting of challenges only if the challenger knows or reasonably believes that the prospective voter is not entitled to vote. *See New Jersey Election Law Revisions,* March and April 1975, pp. 50-54. The role of the federal courts, however, is not to attempt to perfect state election laws. Rather, federal courts may intervene in the election process only if constitutional and federal statutory rights are impaired.

proper to determine the right of the voter to vote.

Final authority as to whether to permit the casting of a ballot resides in the majority vote of the district board members. N.J.S.A. 19:15–24 provides in pertinent part:

The district boards shall not give a ballot to any person unless they shall be satisfied that such person is in all respects qualified and entitled to vote; and for the purpose of satisfying themselves as to the right of any person who shall claim a right to vote they shall have power to examine such person, and any other person or persons, under oath or affirmation, touching such right, except as hereinbefore restricted. The board shall determine the right of the voter to vote, after making use of, and giving due weight to, the evidence afforded by his signature, if any, and such answers, and if any member of the board shall give or assent to give a ballot to any person challenged, without requiring him to take the oath or affirmation hereinbefore prescribed to be made upon such challenge, and the person shall not be qualified and entitled to vote, the member so giving or assenting to give a ballot, shall be deemed to have given to such person a ballot, knowing it to be illegal. The question as to the giving of the ballot to the person shall be put in the following form: "Shall a ballot be given to this person by this board?"

If a majority of the board shall decide to give a ballot to such voter or in case of a tie vote, the voter shall be given a ballot and allowed to vote.

If a majority of the board shall decide against giving a ballot to the voter no ballot shall be given.

Board members may require an individual to sign an affidavit affirming his or her qualifications. N.J.S.A. 19:15–20, 21. Each challenge and the board's determination as to it is to be recorded in the signature comparison record. Persons denied the right to vote by the district board may seek a state court order or a commissioner's order from the County Superintendent of Elections permitting them to vote. N.J.S.A. 19:32–18, 32–41.

1. *Challengers:* Each candidate and the county committee of any political party may appoint two challengers for each election district. N.J.S.A. 19:7–1 and 7–2. However, no more than one challenger appointed for a party, candidate, or public question shall be present at one time. N.J.S.A. 19:7–6.1. N.J.S.A. 19:7–5 states:

Such challengers shall be the authorized challengers for their respective political parties and candidates or for the proponents or opponents of a public question. They shall have the power to challenge the right to vote therein of any person claiming such right and shall have power to ask all necessary questions to determine this right. They may be present while the votes cast at any election are being counted, hear and see the ballots counted and shall have the right and power to challenge the counting or rejecting of any ballot or any part of a ballot. As amended *L.* 1956, *c.* 66, p. 152, Section 4.

2. *District Board Members:* Each district board is made up of four members equally apportioned between the two major parties and appointed by the County Board of Elections. N.J.S.A. 19:6–1 and 6–3. District board members may be removed with or without cause at any time and the vacancy filled by the members of the county board of the same political party as the removed member. Individuals qualify to serve as a district board member if they have voted in a party primary or filed a party declaration form, have not espoused the cause of another political party in the last two years, are "of good moral character," have the ability to read, write, and do math, have good health, and reasonable familiarity with the election laws. N.J.S.A. 19:6–2. District board members may be assigned or transferred to any election district. N.J.S.A. 19:6–7. District board members are given constabulary powers to "preserve the peace and maintain good order." N.J.S.A. 19:6–15. However, if a municipality believes more is needed to main-

tain good order it may assign one or more police officers to any district board. N.J.S.A. 19:6–16.

3. *Penalties:* The election laws provide for mild penalties for general infractions of the law. For example, any person willfully hindering, or delaying voting is subject to a fine of up to $500. N.J.S.A. 19:34–5. Obstructing or interfering with a voter similarly subjects a person to a $500 fine. N.J.S.A. 19:34–6, 19:34–29. Any person interfering with "the voters lawfully exercising their rights of voting at the election, as to prevent the election ... from being fairly and lawfully conducted, shall be guilty of a misdemeanor." N.J.S.A. 19:34–11. Threatening or intimidating voters violates N.J.S.A. 19:34–28. The section specifically setting forth penalties for district board members who willfully disregard or violate election rules only applies in the context of primary elections. N.J.S.A. 19:34–23.

The New Jersey election laws do not specifically forbid discrimination on the basis of race or ethnicity. However, the New Jersey Constitution explicitly states that

No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil or military right ... because of religious principles, race, color, ancestry or national origin.

N.J. Constitution Art. 1, Paragraph 5.

B. *Arguments of the Parties.* Plaintiffs argue that the challengers have been granted unlimited authority by N.J.S.A. 19:7–5, 19:15–18, 19:15–22, and 19:15–24. They contend that such state regulations, going to the "voting process itself," trigger First and Fourteenth Amendment scrutiny. *Anderson v. Celebrezze,* 460 U.S. 780, 786–788, 103 S.Ct. 1564, 1568–1570, 75 L.Ed.2d 547 (1983). The plaintiffs argue that subtle as well as obvious impediments to the voting process may create a "substantial restraint," *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 462, 78 S.Ct. 1163, 1172, 2 L.Ed.2d 1488 or a "significant interference," *Bates v. Little Rock,* 361 U.S. 516, 523, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1960) and hence may violate the Constitution.

Plaintiffs recognize that the state has a legitimate interest in curbing voter fraud but they argue that the statutory framework is unconstitutionally broad and vague and impermissibly burdens the rights of voters by going beyond the procedures necessary to protect the voting process from abuse.

Plaintiffs further assert that challengers enjoy absolute discretion and that this violates Section 2 of the Voting Rights Act of 1965, as amended, which states that

No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees [for language minority groups]....

42 U.S.C. Section 1973.

Plaintiffs demonstrate that Section 2 not only prohibits purposefully discriminatory actions, but also prohibits those practices or systems that have a discriminatory result. *Velasquez v. City of Abilene,* 725 F.2d 1017, 1021 (5th Cir.1984). Section 2 invalidates "election systems that, although constitutionally permissible, might debase the amendments' guarantees." *Jones v. City of Lubbock,* 727 F.2d 364 (5th Cir.1984).

Plaintiffs cite the Senate Judiciary Report on the amendment of the Voting Rights Act in further support of their claims:

[Section 2] also prohibits practices which while episodic and not involving permanent structural barriers, result in the denial of equal access to any phase of the electoral process for minority members.

Senate Report No. 417, 97th Cong., 2d Sess. at p. 30, U.S.Code Cong. & Admin. News 1982, pp. 177, 207.

Plaintiffs point to the consent order I approved in this action on October 18, 1985 to buttress their position that the present statutory scheme is unconstitutional. The consent order was entered in response to

plaintiffs' motion for a preliminary injunction to protect the integrity of the November 1985 General Election. The order required, *inter alia,*

> [t]hat unless provided with an affidavit that a person is not qualified to vote, which affidavit shall specify the reason or reasons why the person is not qualified to vote, each District Board of Elections in Hudson County, for purposes of the November 1985 elections, shall allow all registered voters to establish identity and current residency for electoral purposes by signing an affidavit as to their qualifications and by providing sufficient proof of such identity and residence including but not limited to the following: a valid New Jersey driver's license, a sample ballot which lists the individuals' name, any official city, county, state or federal document which lists the individual's name and address, a recent utility bill, a recent telephone bill, a recent rent receipt, a recent tax receipt, an automobile registration, a recent piece of mail delivered by the U.S. Postal Service or any other document which states the name and current address of the voter.

Consent Order filed October 18, 1985.

Plaintiffs argue in their reply brief that requiring submission of an affidavit by the District Board for each disqualified voter setting forth a basis for the disqualification places the burden of initial responsibility upon the persons wishing to prevent a ballot from being cast. Presumably this would discourage challenges for impermissible reasons such as race, ethnicity, or candidate preference. Furthermore, disqualification affidavits would enable post election analysis and permit later accountability of challengers or district board members who abused their powers or systematically deprived individuals of their rights. Plaintiffs advance the conclusion that the consent order demonstrates that a workable regulatory scheme can be devised to meet the state interests embodied in the present challenge mechanism while protecting the interests of minority voters.

In opposition, the state argues that only such limited discretion is given to challengers and district board members to question the qualifications of voters as is essential to the prevention of illegal and fraudulent voting. The state points to the language of N.J.S.A. 19:15–18 which permits challenges by board members or challengers of those voters they "know, suspect or believe not to be qualified or entitled to vote." N.J.S.A. 19:15–18. Only "proper" and "necessary" questions may be put to a voter by the board to determine the right to vote. N.J.S.A. 19:7–5, 19:15–18, and 19:15–22. The state argues that by implication the only "necessary" and "proper" questions are those that relate to the requisite criteria for voting (age, residence, and citizenship) and the lack of any disqualifying indicia (e.g. idiocy, insanity, or being on probation or parole for an indictable offense). N.J.S.A. 19:4–1 and N.J.S.A. 19:31–5. The state concludes that the law is specific as to voter criteria and therefore does not permit challengers and board members absolute and unlimited discretion.

Defendants argue that if the statutes were to set forth every permissible query this would render inflexible a workable mechanism which has been designed to prevent fraud and abuse. The state also objects to plaintiff's characterization of the laws as constitutionally flawed as a matter of due process law on the grounds of vagueness and overbreadth. The state asserts that New Jersey's election law specifically limits challenges and questioning to those voter requirements enumerated in the statute.

The state argues that if in fact the law governing challengers and district board members was misapplied in Jersey City, that does not necessarily mean that the law, on its face, is fatally flawed. *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The remedy, argues the state, is not to strike down a statutory scheme that has served New Jersey well. Instead, the remedy is to challenge those actors who interfered with voting rights on the basis of race and ethnicity.

Finally, the state argues that the challenged statutes are not violative of the Voting Rights Act because they do not effectuate or permit an infringement on the right to vote by minority voters. *Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984). The state urges that if in fact abuse of voters rights occurred it was because the challenged state statutes were not complied with.

In its reply memorandum, plaintiffs present the transcript of a June 10, 1985, hearing before New Jersey Superior Court Assignment Judge Humphreys on the permissibility of substituting off-duty and unarmed police officers for district board members. Arguments were made that the police officers were to be substituted for experienced district board members in Wards E & F for the purpose of intimidating black and hispanic voters in these predominantly minority districts. Transcript of Hearing before Judge Humphreys on June 10, 1985 at 62. Superintendent Brady stated that the Board of Election had the power to make this substitution. *Id.* at 53. Judge Humphreys ruled that the substitution of unarmed, nonuniformed police officers was permitted by N.J.S.A. 19:6–5. *Id.* at 63.

Plaintiffs forcefully relate a scenario of voter discrimination starting with the use by McCann challengers of color coded voter lists targeting minority voters in the predominantly minority wards E and F. These voters, assert plaintiffs, were required to produce two or more forms of identification to prove their residency and this was a procedure designed to harrass and intimidate voters. Challenges were voted on by board members, sixteen of whom had been replaced by off-duty Jersey City policemen who supported McCann. According to plaintiffs, these police officers intimidated voters and particularly discriminated against black and minority voters. Plaintiffs further assert that these board members did not rule in an impartial fashion on the challenges brought before them but instead reacted in a discriminatory fashion.

The State strongly argues that Title 19, the New Jersey State election law is facially constitutional. Plaintiffs, on the other hand, have offered proofs from which one could conclude that the law can be abused.

### C. *Conclusions*

The gravamen of plaintiffs' constitutional challenge is that district board members and challengers have unfettered freedom under the New Jersey election laws. Plaintiffs assert that challengers and district board members are permitted by state law to harrass and discourage potential voters by asking irrelevant or discriminatory questions with impunity. If in fact this were true, plaintiffs would prevail in their claim as to the unconstitutionality of New Jersey's statutory scheme.

■ No right is more precious in a democracy than the right to vote. *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1976). That the right must be at the pinnacle of our protected freedoms has been recognized since the founding of our democratic form of government. James Madison wrote in the *Federalist Papers*

> The definition of the right of suffrage is very justly regarded as a fundamental article of republican government ... It must be satisfactory to every State, because it is comfortable to the standard established, by the State itself. It will be safe to the United States because, being fixed by the State constitutions, it is not alterable by the State governments, and it cannot be feared that the people of the States will alter this part of their constitutions in such a manner as to abridge the rights secured to them by the federal constitution.

No. 52 at 326 (C. Rossiter ed., 1961). The right to vote is a fundamental right because it preserves all other rights. *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964).

■ Laws which restrict the fundamental right to vote must pass constitutional challenge on two related grounds: first,

the rights of political association and voting must not be impermissibly burdened in violation of the First and Fourteenth Amendments; and second, voters may not be impermissibly discriminated against in violation of the Equal Protection Clause of the Fourteenth Amendment.

In applying the standards of the First and Fourteenth Amendments to state elections laws the Supreme Court has admonished that courts are to be mindful of the difficult and essential task given to the states in making them responsible for the determination of the qualifications of voters. *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

> [A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. In any event, the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates.

*Id.* 415 U.S. at 730, 94 S.Ct. at 1279.

Courts have recognized two competing interests at work: the individual's right to participate in elections without interference and the state's interest in regulating such elections. For example, the Second Circuit in *Republican Party of the State of Connecticut v. Tashjian*, 770 F.2d 265 (1985), weighed these interests. It concluded that Connecticut's closed primary law, which prevented voters who were not enrolled in a political party from participating in primary elections, violated First Amendment associational rights. In so holding, however, it recognized the "inexorable" involvement of the states in the mechanics of elections, characterizing such involvement as inevitable and intrusive. *Id.* at 285.

Each time a state sets hours during which polls will be open, or designates polling places or designs a system for absentee balloting, its choice affects the ability of certain persons to associate for political ends. Nevertheless, as these intrusions become more pronounced, and their effects increase, the ill sought to be cured by governmental involvement must become correspondingly greater.

*Id.* at 285.

Balancing must take place in weighing the interests of the state in preventing fraudulent voting through procedures for checking voter qualifications and the individual right to vote. However, there is no "litmus-paper test" the courts can apply in passing upon the constitutionality of state election laws. *Storer v. Brown*, 415 U.S. at 730, 94 S.Ct. at 1279. Instead the courts must engage in an analytical process, applying the standard most recently set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1982).[4]

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* 460 U.S. at 789, 103 S.Ct. at 1570.

I begin my examination under the factors set forth in *Anderson* by looking to the language of New Jersey's election law. Contrary to plaintiffs' assertions, my read-

---

**4.** I do not rely on freedom of speech cases cited by plaintiff because the Supreme Court explicitly articulated the First Amendment test to apply to state election laws in *Anderson v. Celebrezze, supra.*

ing of the law convinces me that it does not permit unfettered discretion in making challenges. Challengers and district board members may ask only those questions that are "necessary" in challenging a voter's qualifications. N.J.S.A. 19:7–5 and 19:15–18. Furthermore, in deciding upon challenges to a voter's qualifications, the district board is permitted only to ask "proper" questions of the voter. Obviously, "necessary and proper" questions can only pertain to age, residence, citizenship, and lack of disqualifying indicia as specifically set forth in the law. Plaintiffs state that the lack of specificity in the election law as to what are "necessary and proper" questions leads to the discriminatory abuses allegedly suffered by plaintiffs. However, if the statutes were more specifically tailored it would deny the state the flexibility it needs to prevent election fraud and abuse and make it impossible to meet the wide variety of situations in which fraudulent voting practices arise.

 The state has a strong and legitimate interest in preventing voter fraud whether it is in the form of "graveyard" voting or other types of voter fraud. Challengers and district board members perform a vital function in guarding the legitimacy of the voting process. To the extent the challengers and district board members ask "necessary and proper" questions, the burden on plaintiffs' right to vote without undue interference is outweighed by the legitimate interest in preventing election fraud. Therefore, under the analysis directed by *Anderson v. Celebrezze, supra,* plaintiffs cannot prevail. First, although the magnitude of the asserted injury to plaintiffs' right to vote was great, it only occurred *after* New Jersey election law was violated. Second, the state's interest in preventing election fraud is similarly great. In fact, unfettered voter fraud negates the impact of individual votes and destroys the legitimacy of the electoral process. Weighing all the factors as set forth in *Anderson, supra,* I find the state election laws constitutional.

Plaintiff asserts that requiring challengers or district board members to fill out affidavits before proceeding with a challenge would not only require them to take the challenging process more seriously, but also would facilitate the post-election investigation of discriminatory conduct. However, such a requirement might make it impossible to prevent voter fraud. It would prevent challengers and board members from making legitimate inquiry when they have a suspicion or limited knowledge of possible frauds.

An examination of historic case law illustrates plaintiffs' argument. For example, in *Lehlback v. Haynes,* 54 N.J.L. 77, 23 A. 422 (1891), the New Jersey Supreme Court refused to consider the claim that votes were wrongfully rejected where the complaint failed to state "in what districts such rejections occurred, and how many in each district." *See also In re Clee,* 119 N.J.L. 310, 324, 196 A. 476 (1938). However, the election law as now drafted provides a mechanism for determining which voters have been challenged since district board members are required to record each challenge as well as the board's determination as to it in the signature comparison column of the poll book. N.J.S.A. 19:15–24. If a district board member fails to do this he or she may be summarily removed by court order.

 While an affidavit requirement would undoubtedly make challengers and district board members think twice before engaging in the type of conduct that allegedly occurred in Jersey City in the mayoral run off election, it might have other adverse effects in preventing fraud. I do not believe it is up to the district court to take the place of the legislature in engrafting such an amendment onto a statutory scheme that I find constitutional as presently enacted.

If in fact challengers and district board members engaged in a pattern of discriminatory challenges it should be possible to detect this by examining the record of challenges in the poll book. If no record was

kept this is further evidence of failure to adhere to the election laws.

 The allegations of plaintiffs echo the eloquent charge to the Middlesex Grand Jury by Justice Fort in November of 1904. N.J.Law Journal, Vol. XXVII, 1904. Justice Fort described a pattern of refusal by district board members to accept ballots of long time voters. He concluded:

> This is a country, gentlemen, where the majority rule, and the will of the people is supposed to be the supreme law of the land. The legislature enacts the laws for the officials to be governed by and to act under. Election officers cannot set up their own will to deprive people of the right to vote.

*Id.* at 365, 196 A. 476. If a wrong of this nature has been committed, it must be remedied. However, that is a separate question from that of the constitutionality of the elections laws.

 Plaintiffs' claims under the Voters Rights Acts fail for the same reasons that plaintiffs' constitutional claims fail. The problem in Jersey City's mayoral election was not caused by following the state election law, rather it was caused by violations of that law.

In balance, I find that in the rough and tumble world of electoral politics, New Jersey's election laws have generally served the public well. A review of state history reveals that frequently election fraud flourishes where challengers are not permitted to vigorously pursue the credentials of the voters.[5] Conversely, the replacement of corrupt machine candidates has been furthered by challengers who have scrutinized the credentials of "graveyard" candidates. Where vigorous challenging for permissible reasons extends over the line into impermissible discrimination, whether on the grounds of race, ethnicity, party affiliation,

or candidate preference a court action such as the present one is the best corrective course.

Plaintiffs' motion for summary judgment on Counts One, Two, and Six is denied. Defendant-intervenor State of New Jersey's motion for summary judgment on these Counts is granted. Defendant-intervenor's attorney is requested to submit an appropriate form of order.

---

5. The infamous Atlantic County election of 1910 illustrates this point. "More than a thousand illegal registrations were discovered in Atlantic City. Many more such cases were suspected, but the destruction of numerous hotel registers handicapped the investigators. Repeaters brought from as far away as Philadelphia were voted in gangs under various names in several precincts.... At one poll, challengers were given drugged water to put them out of commission; in other districts they were physically intimidated and even arrested. One Democratic poll worker was kidnapped." Richard McCormick, *The History of Voting in New Jersey*, 1953 at 206.